**FONDEDILE, S.A.**

v.

**C.E. MAGUIRE, INC. a/k/a Maguire Group, Inc., et al.**

**No. 90–444–Appeal.**

Supreme Court of Rhode Island.

May 15, 1992.

Richard W. Petrocelli, Visconti & Petrocelli, Providence, for plaintiff.

Christopher Whitney, Adler, Pollock & Sheehan, Anita Flax, Coffey & Martinelli, Ltd., Dorothy Davison, Providence, Elaine Bucci, North Providence, for defendants.

## OPINION

MURRAY, Justice.

This is an appeal by the plaintiff Fondedile, S.A., from a Superior Court judgment entered in favor of the defendants, the city of Providence and C.E. Maguire, Inc. This case concerns a major public works project undertaken by the city of Providence (city) to revitalize its port facilities. In the early 1970s the city hired C.E. Maguire, Inc. (Maguire), to design and supervise a plan to upgrade the municipal wharf at Fields Point in the Port of Providence. At the project's inception berth 3 in the municipal wharf consisted of an unrepaired gravity seawall built at the turn of the century. The original wall was constructed by stacking individual granite blocks on top of each other. No mortar or cement was used to keep the blocks sealed together; instead, the wall's stability was maintained by the considerable weight, irregular external surface, and manner of placement of the individual blocks. Information concerning the wall's design is limited, and the most reliable data is a cross-section drawing dated February 9, 1939, representing a "typical" section of the seawall. The cross-section indicates that the toe at the base of the wall extends to 32.5 feet below mean low water (−32.5 M.L.W.) and that the top rises to approximately +10 M.L.W.

Part of the rehabilitation project required dredging the port to a depth of −35 M.L.W. in front of berth 3. Dredging to this depth, however, threatened the wall's stability because −35 M.L.W. was 2½ feet beneath the base of the wall. If uncorrected, this gap would have caused downward vertical movement of the wall and caused erosion beneath the wall. To prevent movement and erosion, Maguire consulted plaintiff Fondedile, S.A. (Fondedile), an international construction business specializing in soils and grouting, to design a stabilization plan. Based on this consultation, the city adopted a stabilization design using small-diameter cast-in-place root piles to underpin the seawall to the river's subsurface.

A simplified explanation of this design follows. First, the contractor drills a shaft from ground level through the wall, through the underlying soil, and into the supporting subsurface. The shaft is kept open by reinforcing metal casings inserted into the drill hole at prespecified lengths and configurations. Concrete or grout is then poured into the shaft under pressure, and the casings are withdrawn. As the casings are removed, pressure forces grout into openings in the material surrounding the shaft. The grout subsequently adheres to the surrounding material and hardens to form a pile.

The amount of grout required to fill a shaft varies depending on the volume of the shaft and the number of openings in the material surrounding the drillhole. The larger the number and size of these openings, the greater the amount of grout

required to fill these spaces. Consequently, knowledge of site conditions is critical to an accurate estimate of grout requirements. To determine site conditions at berth 3, Maguire hired Guild Drilling Company (Guild) to make test borings of the wall and subsurface soil. Guild bored test holes in April and June 1977 including three borings drilled vertically through the seawall.

On May 3, 1979, the city invited bids on a contract to install pressure-grounded concrete piles to support the existing granite-block gravity seawall at berth 3. Prospective bidders received a packet containing a notice to bidders, a proposal and contract, contract bonds, general and special contract provisions, technical specifications, the Guild boring logs, compression testing results, soil test results, and a set of engineering drawings. A prebid conference was held on May 15, 1979, at which the participants discussed the payment schedule proposed in the contract. One prospective bidder asked whether the city would consider compensating the contractor on a basis of cubic yards of grout consumed instead of the proposed terms of payment for linear foot of root pile installed. The city would not agree to modify the method of payment, and the contract was bid at fixed rates per linear foot of root pile installed.

All bids were submitted by May 29, 1979, and the city accepted Fondedile's bid of $3,489,477.60 on April 25, 1980. On May 11, 1980, the city gave Fondedile formal notice to proceed with the work, and shortly thereafter plaintiff encountered difficulties. On May 20, 1980, Fondedile received a daily work-progress report from its surveyors stating that the seawall had shifted from the position represented in the bid documents. The report detailed movement of approximately twelve inches at the center of the wall and approximately six inches at each end of the wall. Although plaintiff became aware of the movement, it continued to work on the project without formally notifying defendants or making a request to modify the contract due to changed conditions. The plaintiff subsequently encountered problems drilling

through and behind the seawall and discovered that the few drillholes filled with grout required considerably more grout than its bid estimate. In a letter dated October 2, 1980, plaintiff requested permission from defendants to pour grout into the drillholes by hydrostatic pressure instead of pneumatic pressure and to grout piles to a height of two feet below the ground surface. In the letter plaintiff explained that these design changes would reduce the amount of grout used to fill openings surrounding the drill holes.

On October 20, 1980, plaintiff and Maguire met to discuss plaintiff's request (October 20 meeting). The plaintiff expressed concern about excess grout consumed and the corresponding cost. Unrebutted testimony introduced at trial shows that the parties also discussed modifying the contract to provide an alternative method of compensation; specifically that plaintiff requested additional payment for grout consumed in excess of the formula upon which plaintiff made its bid. Although the nature and extent of this discussion was disputed, the trial justice found that no oral agreement regarding payment for excess grout was reached. On November 13, 1980, Maguire gave plaintiff permission to grout all piles up to two feet below the ground surface by hydrostatic pressure.

By February 1981 the parties recognized that plaintiff could not meet the projected completion date. In a letter dated February 10, 1981, plaintiff requested a new completion date of October 31, 1981. This extension was granted on June 9, 1981, as part of a change order authorizing diver operations to seal the face of the seawall. Nowhere, however, in correspondence or negotiations discussing this extension did plaintiff express an expectation to be compensated for extra drilling and grout expenses. Thereafter, in a letter to Maguire dated July 28, 1981, plaintiff claimed that site conditions had worsened considerably since the 1977 drilling tests. In the letter plaintiff alleged a two-foot movement in the wall that caused the backfill to weaken and the configuration of the wall to change. Based on this movement plaintiff

requested permission to stabilize the backfill and to fill all voids by grouting piles to ground elevation. In a letter dated September 24, 1981, defendant disputed the amount of movement and reiterated its consent for plaintiff to grout to two feet below ground surface.

The plaintiff continued to fall behind schedule, and on October 14, 1981, requested another time extension to complete the project. In its written request plaintiff cited greater wall depth, greater grout consumption, drilling problems, diver operations, and a workers' strike as grounds for the extension. The request again contained no demand for additional payment, and on November 13, 1981, a change order was executed giving plaintiff an additional nine months to complete the project.

On December 18, 1981, plaintiff filed a claim for extra costs totalling $2,663,-749.83. The detailed statement accompanying the request divided the costs among piles drilled below twenty-nine feet, excess grout consumed by the wall and backfill, drilling difficulties caused by the relaxation of the backfill, changed design in row C piles, and the use of a diver crew. Two weeks later Maguire summarily denied the claim. Maguire and the city's construction manager subsequently met with plaintiff on March 8, 1982. At this meeting plaintiff renewed its claim, and Maguire explained its corresponding reasons for rejecting the claim. On May 6, 1982, the city formally denied plaintiff's claim. The plaintiff completed work on September 1, 1982, and the city paid plaintiff the full contract price.

On September 9, 1983, plaintiff filed suit against defendants to recover the extra costs denied by the city. The plaintiff claimed damages for extra costs under theories of (1) express and implied warranty, (2) oral modification to the contract, and (3) quasi-contract. The Superior Court trial commenced on January 9, 1989, and the presentation of evidence concluded on February 7, 1989. The following day the court granted defendants' motion to dismiss plaintiff's claim of oral modification to the contract. After reviewing posttrial memoranda the trial justice issued a decision on September 7, 1989, containing detailed findings of fact and entering judgment for both defendants. In his decision the trial justice found Maguire negligent for its failure to disclose movement of the seawall in contract documents. Nevertheless, the trial justice determined that plaintiff was unable to recover because it failed to prove this negligence was the proximate cause of plaintiff's damages. The plaintiff filed an appeal raising seven issues of error. In denying plaintiff's appeal we address each issue separately.

## MOTION TO DISMISS

First, plaintiff asserts that the trial justice erred in granting defendants' motion to dismiss count 2 of plaintiff's amended complaint (count 2). Count 2 alleged that Fondedile was the beneficiary of an express oral agreement by the city, made by the city's agent Maguire, to pay for costs above the contract price. In dismissing count 2 the trial justice found insufficient competent evidence supporting plaintiff's claim that the parties entered into an express oral agreement.

The plaintiff asserts this finding is incorrect because of unrebutted testimony by Fondedile's project manager at berth 3, Pier Luigi Iovino (Iovino). At trial Iovino testified that at the October 20 meeting he requested that Fondedile be reimbursed for grout consumed in excess of the amount Fondedile estimated in its bid. He stated that in making its bid, Fondedile estimated the piles' rate of grout consumption as three times the piles' theoretical volume, and that the few piles completed prior to the October 20 meeting required substantially more grout than this calculation. Iovino stated that during the ensuing discussion Maguire agreed that the city would pay plaintiff for excess grout consumed in the project; specifically that the city would reimburse Fondedile for grout consumption in excess of four times the piles' theoretical volume. Iovino further testified that the parties agreed to calculate final payments at the end of the project because uncertain soil conditions made accurate estimates impossible and that based on this under-

standing Fondedile completed the project. Accordingly, plaintiff asserts that Iovino's unrebutted testimony provides sufficient competent evidence showing that the parties entered into an enforceable express oral agreement.

 Contracts for public works or the supply of materials to public bodies are governed by general principles of contract law, and in particular, by the principles of private building-and-construction contract law. *See generally* 64 Am.Jur.2d *Public Works And Contracts* §§ 12, 17 (1972). Under these principles parties to a contract can mutually assent to modify a contract if the modification does not violate the law or public policy and if the modification is supported by adequate consideration. *Angel v. Murray,* 113 R.I. 482, 489, 322 A.2d 630, 634 (1974). Furthermore, under certain circumstances, parties can modify a contract's written terms by subsequent oral agreement even if the contract requires that modifications be made in writing. *See, e.g., Menard & Co. Masonry Building Contractors v. Marshall Building Systems, Inc.,* 539 A.2d 523, 526–27 (R.I.1988); *MBT Construction Corp v. Kelhen Corp.,* 432 A.2d 670, 674–75 (R.I.1981).

 A modification to an enforceable contract requires that the parties assent to the essential terms of their obligations and that an agreement embrace these terms. *See Donovan v. Freeway Construction Co.,* 551 F.Supp. 869 (D.R.I.1982). The modification can be written, oral, or implied, *Menard,* 539 A.2d at 526, but the burden of proving the existence of the modification rests with the party alleging the new contract. *In re Ewing,* 39 B.R. 59 (Bkrtcy.D.R.I.1984). To satisfy this burden, the party alleging the modification must show that the parties demonstrated both subjective and objective intent to be bound by the new contract's terms. *See Smith v. Boyd,* 553 A.2d 131, 133 (R.I. 1989).

 In claiming that the parties entered into an enforceable oral modification at the October 20 meeting, plaintiff asserts that Iovino's unrebutted testimony is competent evidence showing Maguire's subjective and objective intent to modify the contract. The plaintiff correctly asserts that parties can modify terms of an underlying contract despite an express requirement that the modification be in writing. However, to overcome an express provision that all modifications be in writing, the party claiming the oral modification must show that the parties waived their contractual rights with respect to the express condition in the contract. *Menard,* 539 A.2d at 526–27. A review of the record shows that defendants did not waive their contractual rights. Evidence introduced at trial reflects strict compliance with the express clause to the original contract providing for modification of the original contract. Article 31 of the original contract provides:

> *"MODIFICATION OF CONTRACT:* No alteration of this Contract can be made except by an agreement in writing signed by the parties hereto, pursuant to a vote of the Board, and approved by the surety or sureties on the bond of the Contractor for the performance of the Contract and any alteration thereof not so made is not valid or binding on the City."

Prior to the October 20 meeting the parties had negotiated two modifications, and each of these modifications was executed under a written change order in compliance with article 31.

Iovino's unrebutted testimony indicates that the parties discussed alternate compensation for the grout. This testimony at best reflects a subjective intent by Maguire to modify the contract; however, even if this discussion satisfies the subjective-intent requirement, it does not demonstrate Maguire's objective intent to modify. Both the express provisions of the contract and the parties' prior practice show that in modifying the original contract defendants manifested objective intent through a written change order. Because no written change order concerning grout compensation was ever executed, defendants never manifested an objective intent to contract, and no valid modification was formed. Consequently plaintiff failed to meet its burden of proof, and the trial justice cor-

rectly dismissed count 2 of the amended complaint.

### HANDWRITTEN NOTES

■ The plaintiff's second claim is that the trial justice incorrectly excluded plaintiff's exhibit No. 16 for identification (exhibit 16) from evidence. Exhibit 16 consists of handwritten notes taken by a Maguire employee, a Mr. D. Nacci, at the October 20 meeting. Of particular concern to the instant appeal is a sentence on page 2 of these notes stating "The wall, City to pay grout by cubic foot or yard after grout take in excess of 4x theoretical volume."

The parties agree that it was a regular practice for a Maguire representative to take notes at meetings and that the notes were later typed and distributed. The notes identified attendees at the meeting, topics discussed, and specific statements made by parties. An examination of exhibit 16, however, shows that the notes from the October 20 meeting are not complete. The first page of the notes identifies the declarant of each recorded statement, but subsequent pages do not. Beginning on page 2 the notes simply contain a series of statements that are not attributed to any party.

During the trial and related hearings the trial justice addressed the admissibility of exhibit 16 on three separate occasions. On all three occasions the trial justice refused to enter the exhibit into evidence because plaintiff failed to provide adequate foundation identifying the declarant of the critical statement on page 2. The trial justice explained that Nacci's function as secretary was to record statements of all persons present at the October 20 meeting, not to record only statements made by Maguire representatives. Therefore, the trial justice concluded that absent further foundation identifying the declarant, the notes could not be admitted into evidence as a statement made by a Maguire representative.

The plaintiff asserts that exhibit 16 is admissible under Rule 801(d)(2) and Rule 803(6) of the Rhode Island Rules of Evidence. The plaintiff first claims that the notes are nonhearsay statements made by a party-opponent admissible under Rule 801(d)(2). The plaintiff asserts that Nacci is an agent of Maguire, the party-opponent, and that the notes were taken within the scope of his employment with Maguire. Rule 801(d)(2) provides in part:

"(d) *Statements Which are Not Hearsay.* A statement is not hearsay if:

\* \* \* \* \* \*

"(2) *Statement by Party Opponent.* The statement is offered against a party and is (A) the party's own statement, in either the party's individual or a representative capacity or \* \* \* (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the party's agency or employment, made during the existence of the relationship \* \* \*."

As the party introducing the document into evidence, plaintiff bears the burden of laying a proper foundation. Paramount to this requirement is the identification of the declarant. An out-of-court statement may not be introduced as a nonhearsay statement of a party-opponent unless the party introducing the evidence identifies the declarant as a party-opponent. The mere recording of an unidentified person's statement by a party-opponent is insufficient in itself to be an admission under Rule 801(d)(2). Consequently the statement cannot be introduced as an admission by Maguire because the statement cannot be attributed to Maguire.

■ In the alternative, plaintiff asserts that the notes are admissible under Rule 803(6), the business-records exception to hearsay. To be admissible under Rule 803(6), a hearsay business record must satisfy four general requirements. First, the record must be regularly maintained in the course of a regularly conducted business activity. Second, the source of the information must be a person with knowledge. Third, the information must be recorded contemporaneously with the event or occurrence, and fourth, the party introducing the

record must provide adequate foundation testimony. Rule 803(6) Advisory Committee Note [hereinafter Advisory Note]. To provide adequate foundation a party must prove the first three requirements and authenticate the document or record. *See generally* 4 Louisell & Mueller, *Federal Evidence*, § 446 at 649–67 (1980).

■ The business-records exception to hearsay is premised on the unusual reliability of records supplied by systematic checking and on a business's reliance on the precision of records created through regular habits. Advisory Note. The scope of records included within the exception has grown, and in general the rule is interpreted expansively in favor of admitting hearsay records into evidence. In most situations a trial justice should interpret foundation requirements in favor of admitting records and thereafter let the trier of fact determine the evidence's probative value. Nevertheless, this expansive interpretation should not allow admission into evidence of a business record that is not reliable or is not trustworthy. To this end Rule 803(6) expressly authorizes the court to exclude business records when the "source of information or the method or circumstances of preparation indicate a lack of trustworthiness." *See International Brotherhood of Electrical Workers, Local No. 99 v. United Pacific Insurance Co.*, 573 A.2d 270, 273 (R.I.1990).

In the instant case the trial justice had sufficient reason to question the reliability of the notes. The declarant of the critical statement was not identified, and plaintiff failed to present foundation evidence identifying defendant as the declarant. Furthermore, at the time the trial justice was ruling on the admissibility of exhibit 16, Maguire made Nacci available to testify. The plaintiff refused to examine Nacci, however, explaining that Nacci might provide testimony unfavorable to plaintiff's case. This failure to examine an available witness who could resolve questions concerning ambiguities in the exhibit coupled with plaintiff's failure to identify the declarant of statements within the notes provided reason for doubt concerning the relia-

bility of the notes. Accordingly the trial justice's decision to exclude exhibit 16 from evidence was not an abuse of discretion.

## SEAWALL MOVEMENT

■ The third issue of error raised on appeal is that the trial justice misconstrued material evidence. The plaintiff claims that the trial justice misunderstood testimony of William Zoino (Zoino), Fondedile's geotechnical expert, in determining the nature of the seawall's movement. Finding of fact No. 10 states:

"The Court rejects the testimony of Iovino that the movement of the seawall caused its granite blocks to move relative to one another. *The Court accepts the testimony of other witnesses, including William Zoino, called by the plaintiff, that the wall moved integrally.* Indeed, the plaintiff's theory that the seaward rotation of the top of the wall caused a relaxation of the backfill through which it had to drill to reach the back side of the wall depends on the whole wall rotating away as an integral unit from its overburden. While the wall rotation might have caused some intramural fracturing of the granite blocks, the Court does not find that any such disruptions contributed materially to the grout loss or drilling difficulties the plaintiff encountered in and below the wall." (Emphasis added.)

The plaintiff claims that this finding is incorrect because Zoino testified that individual granite blocks making up the wall moved at different rates relative to one another and that the wall did not move as a uniform, integral unit.

The record supports plaintiff's claim. Zoino testified that the wall did not move monolithically and that in his opinion the wall moved throughout its entire height in varying amounts. Zoino also testified that wall movement increased the number of voids in the wall thereby causing increased grout consumption to fill the voids. These statements on the record show that the trial justice erred in basing his finding of fact in part on Zoino's testimony. This mistake, however, does not rise to preju-

dicial error, because the precise nature of the wall's movement is not determinative of plaintiff's right to recover.

The plaintiff made its claim for increased drilling and grouting costs on a theory that wall movement increased the number and size of voids in the wall thereby increasing drilling difficulties and causing excess grout consumption. The plaintiff never proved, however, that wall movement was the proximate cause of plaintiff's damages. Therefore, the exact manner in which the wall moved does not affect the outcome of plaintiff's claim, and any mistake made by the trial justice in determining the nature of the wall's movement is nonprejudicial. *See Ryer v. Hyde*, 21 R.I. 485, 44 A. 719 (1899).

## PROXIMATE CAUSE

■ The plaintiff next claims that the trial justice erred in finding that Maguire's failure to disclose wall movement to plaintiff was not the proximate cause of plaintiff's increased costs for extra work. The trial justice found that Maguire knew that the wall had moved from the position represented in contract documents yet failed to disclose this movement to plaintiff. Although Maguire was found to have breached its duty to disclose this information, the trial justice determined that plaintiff could not recover damages for extra work because plaintiff failed to prove that Maguire's negligence was the proximate cause of plaintiff's damages.

To show proximate cause a plaintiff must prove that its injury would not have occurred but for the defendant's negligence. *Schenck v. Roger Williams General Hospital*, 119 R.I. 510, 382 A.2d 514 (1977). This causal connection between negligence and injury must be established by competent proof and cannot be based on conjecture or speculation. *Evans v. Liguori*, 118 R.I. 389, 374 A.2d 774 (1977). Accordingly, plaintiff may not recover unless it proves that but for Maguire's failure to disclose wall movement, plaintiff would not have incurred excess costs for drilling and grout consumption.

The plaintiff's surveyors informed Fondedile of wall movement shortly after plaintiff commenced the project. The plaintiff continued to work on the project, however, and began to experience drilling problems and excess grout consumption. To reduce overall grout consumption plaintiff requested permission in a letter dated October 2, 1980, to grout piles to ground elevation by hydrostatic pressure. Permission was granted to grout to two feet below ground level, but plaintiff was unable to meet the construction schedule. The following summer plaintiff requested permission to grout behind the wall and again requested permission to grout piles to ground level. In its written request, plaintiff explained that this process would stabilize the backfill and fill voids in the wall. Thereafter defendants granted permission to grout behind the wall and reasserted their approval to grout piles to two feet below ground level. Nowhere, however, in either letter or corresponding negotiation did plaintiff identify, or did defendants acknowledge, wall movement as the cause of increased grout consumption or did plaintiff request additional compensation due to changed site conditions.

To recover extra costs plaintiff must show a causal link between Maguire's failure to inform plaintiff of site conditions and additional expenses incurred by plaintiff because it was not aware of these site conditions. The plaintiff fails to provide this connection. Once plaintiff learned that the wall had moved, Maguire's negligence in reporting wall movement became moot with respect to subsequent decisions made with knowledge of actual site conditions. Accordingly plaintiff is responsible for its own decision, made after it acquired knowledge of the wall's movement, to continue the project without requesting extra compensation or notifying defendants of changed site conditions. For this reason the trial justice did not err in ruling that plaintiff failed to show that Maguire's negligence was the proximate cause of plaintiff's damages.

## IMPLIED WARRANTY

■ The plaintiff's fifth claim is that the trial justice incorrectly ruled that the con-

tract's plans and specifications did not contain an implied warranty as to the condition of the wall and soil. The plaintiff asserts that defendants possessed superior knowledge of site conditions that were not disclosed to plaintiff in contract documents and that this failure to disclose negates express and implied-warranty disclaimers within the contract.

Failure to disclose subsurface conditions that result in greater costs to a contractor warrants recovery by the contractor for its increased costs of work and damage. *D. Federico Co. v. New Bedford Redevelopment Authority*, 723 F.2d 122 (1st Cir. 1983). Although *Federico* imposes an affirmative duty on the owner to disclose relevant information concerning site conditions, plaintiff misapplies the rule of law in its appeal. *Federico* entitles recovery for excess costs incurred that are due to the failure to disclose, but in the instant case plaintiff incurred no extra costs due to Maguire's failure to report the wall movement. The plaintiff was aware of wall movement when it received a work report from its surveyors on May 20, 1980. The plaintiff subsequently requested permission to change grouting procedures, but in the request plaintiff did not claim that wall movement necessitated these changes. Accordingly plaintiff's request to change the grouting design without requesting additional payment was made with full knowledge that representations of soil and wall conditions in the contract were inaccurate, and plaintiff cannot recover under a claim that it relied on an implied warranty of the conditions represented in the contract.

## EXPRESS WARRANTY

■ The sixth issue on appeal is that the court erred in denying plaintiff's recovery under a theory of express warranty. The plaintiff claims that defendants breached an express warranty contained within the bid packet that site conditions were based on the best available information. The plaintiff asserts that laboratory soil analysis, drilling logs, and the project design contained within the bid packet represent express warranties of site condition

that were breached by defendants' failure to disclose wall movement.

In preparing the bid packet Maguire repeatedly drafted express provisions requiring the contractor to personally examine site conditions and to not rely on information provided in the bid packet. The proposal to contract states:

"Bidders are required to submit their Bids upon the following express conditions, which shall apply to and become a part of every Bid received, namely: *Bidders must satisfy themselves by personal examination at the site of the proposed work and by such other means as they may prefer, as to the actual conditions, requirements and limits of the proposed work, and as to the accuracy of information and statements herein contained, and the submission of any Bid will be accepted by the City as satisfactory proof that the Bidder has satisfied himself in these respects."* (Emphasis added.)

Paragraph 37 of the contract's general provisions disclaims responsibility for accuracy of data provided in the bid packet and explains that test borings provide general information only and are subject to error and misunderstanding.

"*SUBSURFACE DATA:* Each bidder is expected to examine the site and the compiled record of investigations and information and then, based upon his own inspections, interpretations and such other investigations as he may desire, decide for himself the character of material to be encountered and determine for himself annual and seasonal variations in water levels which may affect his work. * * * *No warranty, either expressed or implied is made by the City and Engineer for data shown on the Drawings or presented in said Appendix A."* (Emphasis added.)

An even more comprehensive disclaimer of knowledge and responsibility for subsurface conditions appears as a note on drawing No. 3 of the engineering drawings, entitled "Municipal Wharf Rehabilitation, Berth 3, Generalized Subsurface Exploration Plan."

"The attention of the Contractor is directed to the fact that by reason of methods commonly used for obtaining and expressing boring data, this information and data may be limited and subject to error of misunderstanding. * * * *The Engineers and City together with their agents will not assume responsibility for any consequences, delays, expense or losses which may occur or have occurred in the event that such indications shall be found to be incomplete, incorrect or misleading, nor shall such variations or inaccuracies in the indication of subsurface information and data constitute grounds for revision in the contract unit prices or the time of completion, unless otherwise stated in the contract documents."* (Emphasis added.)

These provisions reflect a consistent effort by defendants to shift risk and liability for existing and unforeseen surface conditions to the contracting party. In light of these provisions, the trial justice did not err in ruling that there was no express warranty contained within the contract and its related documents.

## QUASI–CONTRACT

 The plaintiff's final issue on appeal is that the trial justice erred in denying plaintiff recovery under a theory of quasi-contract. The plaintiff claims that it conferred a benefit on the city of extra contractual work performed due to changed site conditions. The plaintiff calculates its costs for extra labor and material as $2.5 million and asserts that failure to compensate plaintiff for these costs will unjustly enrich the city.

Recovery in quasi-contract requires a plaintiff to prove that "(1) the plaintiff conferred a benefit on the defendant, (2) the defendant appreciated the benefit, and (3) under the circumstances it would be inequitable for the defendant to retain such benefit without payment of the value thereof." *Hurdis Realty, Inc. v. Town of North Providence*, 121 R.I. 275, 278, 397 A.2d 896, 897 (1979); *Bailey v. West*, 105 R.I. 61, 67, 249 A.2d 414, 417 (1969). The obligation to pay in cases of quasi-contract

" 'arises, not from consent of the parties, as in the case of contracts, express or implied in fact, but from the law of natural immutable justice and equity.' " *Hurdis Realty*, 121 R.I. at 278, 397 A.2d at 897.

The plaintiff's claim in quasi-contract fails to satisfy the elements for recovery outlined in *Hurdis*. The plaintiff failed to confer a benefit on defendants for which defendants did not bargain. The plaintiff agreed to install a specific number of root piles of various lengths to stabilize the seawall. The contract set a fixed rate of compensation for linear foot of root pile installed, and the city paid plaintiff for each linear foot at the agreed-upon price. There is no dispute that plaintiff lost money on the project and that the city became aware of plaintiff's difficulties during the course of the project. Nevertheless, the city had no reason to believe that it, or its engineers, were responsible for delays, or that it was responsible for 'grout consumption on any basis other than unit price per linear foot. The city bargained for plaintiff's services, and it did not impede plaintiff's ability to perform. The city fulfilled its contractual obligation by paying the agreed compensation, and consequently did not appreciate a benefit for which it had not bargained.

Assuming that the fair value of the job turned out to be more than the contract price, plaintiff failed to show that any of the excess value was due to defendant's actions, a changed condition, or an unforeseen condition. To recover plaintiff must attribute its loss to something other than its own actions. There is nothing in the record to suggest that plaintiff merely underbid the contract, or that plaintiff's own decision to grout to two feet below ground elevation and to grout the backfill resulted in its extra costs. Furthermore, plaintiff failed to show that excess costs were not attributable to plaintiff's own inefficiencies, poor job preparation, and management techniques.

As a general rule contracts among equals are not subject to postexecution judicial scrutiny for fairness or reallocation

of risks and rewards. Fondedile is an international contractor with vast experience in major public works projects, and this experience made it an equal when it negotiated the contract with the city. The bid and the contract documents clearly transfer the risk of unexpected soil conditions to Fondedile. The contract clearly makes payment based on linear foot of root pile installed and provides no allowance for grout payments based on cubic yard of grout consumed. The plaintiff requests the court to alter the terms of this understanding. It would be unjust after execution of the contract and completion of the work to deprive the city of the benefit for which it bargained. If the city was enriched because it made a good deal for itself, the enrichment is not unjust. Although the plaintiff may have negotiated a bad contract, the surrounding circumstances do not satisfy the prerequisites for recovery in quasi-contract.

Therefore, for the reasons stated, the judgment of the Superior Court is affirmed. We reverse in part with respect to the trial justice's finding of fact No. 10. This mistake concerning the nature of the seawall's movement, however, constitutes nonprejudicial error. Accordingly, the plaintiff's appeal is denied and dismissed and the case is remanded to the Superior Court.