### RHODE ISLAND MANAGED EYE CARE, INC.

### v.

### BLUE CROSS & BLUE SHIELD OF RHODE ISLAND.

Nos. 2008–216–Appeal, 2008–217–Appeal.

Supreme Court of Rhode Island.

June 24, 2010.

Jason C. Preciphs, Esq., Providence, for Plaintiff.

R. Daniel Prentiss, Esq., for Defendant.

Present: SUTTELL, C.J., GOLDBERG, ROBINSON, and INDEGLIA, JJ.

**OPINION**

Chief Justice SUTTELL, for the Court.

This appeal and cross-appeal arise out of a breach-of-contract claim by the plaintiff,

Rhode Island Managed Eye Care, Inc. (RIMEC), against the defendant, Blue Cross & Blue Shield of Rhode Island (Blue Cross). The parties executed a series of contracts in which RIMEC agreed to provide managed-eye-care services to some of Blue Cross's members, and payment by Blue Cross was to be based on the number of active members enrolled in the program. In its complaint, RIMEC primarily alleged that it did not receive payment for all of the Blue Cross members for whom it provided services. Following a lengthy trial, a jury rendered a verdict in favor of RIMEC. In response to a motion by the defendant, the trial justice granted a new trial as to lost profits, finding the jury's verdict in this regard to be against the weight of the evidence. The plaintiff appealed this decision, and the defendant cross-appealed, challenging the admittance of certain business records into evidence. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

**I**

**Facts and Procedural History**

Blue Cross is a not-for-profit corporation that contracts with physicians, hospitals and laboratories to provide prepaid healthcare plans, under which members receive medical services at specified rates and charges. RIMEC is a corporation that was formed by Peter A. Koch to be a third-party administrator of vision-care services for customers of health insurance providers such as Blue Cross.[1] In 1993, the parties entered into the first of three contracts in which RIMEC agreed to provide vision-care services to Blue Cross's "Healthmate 2000" subscribers. The con-

1. Although RIMEC is still in existence, Mr. Koch testified that it currently is inactive.

tracts provided that Blue Cross would pay RIMEC a predetermined, per-member fee for all services, referred to as a "capitation fee."

In the beginning of the parties' relationship, RIMEC developed original software called a "membership processing system." This computer software accepted downloads from Blue Cross containing basic subscriber information, such as names, addresses, phone numbers, and dates of coverage. Using that system, RIMEC generated so-called "membership data reports" that ostensibly recorded all active members of Healthmate 2000 during a given reporting period. Twenty of these "membership data reports" were admitted into evidence at trial, and their admission is at issue on appeal.

RIMEC's third and final contract with Blue Cross was, by its terms, set to expire on January 31, 1998. Blue Cross terminated the contract, allegedly for cause, three months early on October 31, 1997. Blue Cross contends it was not satisfied with RIMEC's performance of the contract. RIMEC counters that Blue Cross did not have cause and that, therefore, the termination constituted a breach of contract.

The plaintiff filed a complaint on January 7, 1998, alleging breach of contract. The case was tried before a jury from July 23, 2007, to August 8, 2007. The trial justice declined to preclude, *in limine*, introduction of the disputed computer printouts into evidence. Thereafter at trial, following the testimony of Mr. Koch and another witness, the trial justice admitted the documents as full exhibits.

Mr. Koch testified about the relationship between plaintiff and defendant, as well as regarding RIMEC's computer system. Mr. Koch conceded that he did not program computers, and he admitted generally that he was not a "computer guy." As a result, Mr. Koch acknowledged that he needed experts to help him manage the large amount of data required to run his business.

Mr. Koch described the creation and management of the company's computer system as a "team effort." Mr. Koch testified that Rosemary Ferreira was the administrator of RIMEC and ran the day-to-day operations, while Diane Field specifically managed the computer system. Further, he testified that he initially hired a full-time employee to develop the software, but the employee left after the software was "up and running[.]" According to Mr. Koch, for the next year and a half, the software was maintained by Lauren Knapp, another full-time employee. After that time, a part-time programmer was brought in on occasion, as needed.

Mr. Koch also testified that, at times over the course of their contractual relationship, RIMEC's "computer people" met with Blue Cross's "computer people." Specifically, Mr. Koch stated that he and his "computer people" met with Blue Cross employees during the first few months of the parties' business relationship, and that "all the computer people worked together to try to get [the companies' systems] compatible." Mr. Koch acknowledged that he did not personally test RIMEC's software to make sure it was compatible with Blue Cross's data files, but he stated that he did have personal knowledge of the effort to make the systems compatible because he attended the relevant meetings.

Once the computer system was functional, Mr. Koch testified, the system was "beta tested." He described beta-testing as making sure a computer system performs its tasks correctly by downloading sample data. Mr. Koch acknowledged that RIMEC did not use any data files from

Blue Cross during the beta-testing process.

Mr. Koch stated that he had personal knowledge of how the membership data reports were generated and how they were used by RIMEC. According to Mr. Koch, RIMEC's computer system contained an accounting module that enabled RIMEC to count the number of Healthmate 2000 subscribers. Mr. Koch testified that the membership data reports generated by RIMEC recorded the number of active subscribers, as gleaned from the information downloaded from Blue Cross. Mr. Koch explained the contents of the membership data reports, line by line.

Mr. Koch also testified about how the software recognized Blue Cross members who were not Healthmate 2000 subscribers. Specifically, Mr. Koch stated that the beginning date and end date of coverage were recorded as the same day, and therefore the member would not be included in the active subscriber count. Mr. Koch testified that, at times, RIMEC made adjustments to the membership data upon learning that an individual or group had been added or dropped from membership.

Mr. Koch explained that for the first six or seven months of the parties' relationship, Blue Cross would give RIMEC "big reel[s] of data" containing information about their subscribers on a monthly basis. After these initial months, Blue Cross developed an "FTP" or "file transfer protocol" which, as Mr. Koch described it, involved Blue Cross depositing information in a computer database that RIMEC could access and download remotely over telephone lines. Mr. Koch recounted that he personally observed some of Blue Cross's downloads being received.

Mr. Koch testified that the reports were made in the regular course of business, and that the reports were generated on the "run-date" indicated on each report. He acknowledged, however, that RIMEC did not preserve all the records and data files that contained the member information received from Blue Cross, believing that the missing records and data files had been inadvertently lost or destroyed.

Additionally, Allan MacArthur, a former employee of Blue Cross who was trained in computer analysis and programming, also testified about RIMEC's software. In order to complete a report for Blue Cross, Mr. MacArthur analyzed the functioning of the software RIMEC used to produce the Healthmate 2000 membership counts. The document Mr. MacArthur created was entitled "RIMEC Analysis" and was dated June 23, 1997. Mr. MacArthur testified that in terms of the way the computer program was structured he "didn't see any real problems." Further, in this report, Mr. MacArthur described the process by which RIMEC downloaded member information from Blue Cross, and stated that he believed "RIMEC [was] calculating members accurately * * *." Following Mr. MacArthur's testimony, the trial justice admitted the documents as exhibits in full.[2]

Kimberly Booth testified on behalf of RIMEC in regard to its claim for lost profits. Ms. Booth stated that RIMEC's net income for 1997 was $68,981, as reported on its tax return for that year. This figure derived from its gross receipts in 1997 of $2,154,912, also as reported on its tax return. For purposes of her analysis, Ms. Booth added to the net profit two

2. Two other former RIMEC employees, Ms. Field and Ms. Ferreira, also testified about RIMEC's computer system and the disputed documents. We will not recount their testimony because both women testified after the trial justice ruled on the admissibility of the documents.

sums which, in her opinion, reflected the amounts RIMEC was underpaid by Blue Cross in 1997: $21,316.65 and $44,483.92. This resulted in an adjusted net income for 1997 of $134,781.57. Because Blue Cross terminated the contract ten months into 1997, she divided this sum by ten to arrive at a monthly net profit of approximately $13,478.16. She multiplied this amount by three to reflect the three-month period by which the contract was shortened, and arrived at an estimated lost-profits calculation of $40,434.48.

The jury ultimately rendered a verdict in plaintiff's favor for the sum of $152,100.42, which included the $40,434.48 lost-profit figure suggested by Ms. Booth. Final judgment for plaintiff was entered on August 28, 2007.

Subsequently, on January 29, 2008, the Superior Court considered motions filed by Blue Cross for judgment as a matter of law and a motion for a new trial. In its motion for a new trial, Blue Cross renewed its objection to the admission of the disputed printouts, and it challenged the jury's verdict as being against the weight of the credible evidence put forth at trial. The trial justice denied that portion of Blue Cross's motion that challenged the admission of evidence, but ordered a new trial on the issue of lost profits unless RIMEC accepted a remittitur in the amount of $40,434.48, concluding that the jury's award, in this regard, was against the weight of the evidence. Cross-appeals ensued.

## II

## Discussion

## A

### Admission of Hearsay Business Records

RIMEC contends it was owed monthly "capitation payments" from Blue Cross.

Monthly capitation payments were supposed to have been based on the number of Blue Cross members eligible for RIMEC's services. RIMEC's primary evidence of the alleged payment discrepancy were twenty of its membership data reports. Blue Cross alleges that these documents were not business records subject to the business-records exception to the hearsay rule and that circumstantial evidence casts doubt on their authenticity. Moreover, Blue Cross suggests, contrary to Mr. Koch's testimony, that the missing data files and membership data reports may not have been inadvertently lost or destroyed.

■ Rule 803(6) of the Rhode Island Rules of Evidence is colloquially known as the "business-records exception" to the hearsay rule. "The business-records exception * * * is premised on the unusual reliability of records supplied by systematic checking and on a business's reliance on the precision of records created through regular habits." *Fondedile, S.A. v. C.E. Maguire, Inc.*, 610 A.2d 87, 94 (R.I.1992). Rule 803(6) provides that to be admissible a business record must be "made at or near the time [of the act, event, condition, opinion, or diagnosis at issue] by, or from information transmitted by, another person with knowledge * * *." Further, the rule requires that the record have been "kept in the course of a regularly conducted business activity," which must be "shown by the testimony of the custodian or other qualified witness." However, the rule also provides that a business record should not be admitted if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." *Id.*

■ Over time, "[t]he scope of records included within the exception has grown, and in general the rule is interpreted expansively in favor of admitting hear-

say records into evidence." *Fondedile S.A.*, 610 A.2d at 94. Thus, "[i]n most situations a trial justice should interpret foundation requirements in favor of admitting records and thereafter let the trier of fact determine the evidence's probative value." *Id.*

We have enunciated a four-part test, based on the rule, for the admissibility of a hearsay business record:

"First, the record must be regularly maintained in the course of a regularly conducted business activity. Second, the source of the information must be a person with knowledge. Third, the information must be recorded contemporaneously with the event or occurrence, and fourth, the party introducing the record must provide adequate foundation testimony." *Fondedile S.A.*, 610 A.2d at 93–94.

In order "[t]o provide [an] adequate foundation a party must prove the first three requirements and authenticate the document or record." *Id.* at 94.

Rule 901 of the Rhode Island Rules of Evidence addresses the authentication of evidence. "In making Rule 901 determinations, trial justices must decide whether there is enough support in the record to conclude that it is 'reasonably probable' that the evidence is what the offeror [pro]claims it to be." *State v. Oliveira*, 774 A.2d 893, 926 (R.I.2001) (quoting *State v. Griffin*, 691 A.2d 556, 558 (R.I. 1997)). "If so, then the evidence's [per-]suasive force is for the jury to decide." *Id.*

Under Rule 901, a document's authenticity may be established in any number of different ways. Rule 901(b)(1) provides "[b]y way of illustration only, and not by way of limitation," that the rule will be satisfied if a witness with knowledge testifies that "a matter is what it is claimed to be." In *State v. Calenda*, 787 A.2d 1195 (R.I.2002), we addressed the authentication of a computer printout as a business record. In that case we explained that, "[e]ssentially, a person who is knowledgeable about the preparation of records and their use in the course of the business is capable of identifying them sufficiently to satisfy the prerequisite for their admission as business records." *Id.* at 1200. Further, the party who authenticates the document need not be the custodian of the records to lay an adequate foundation, and foundation testimony may be supplied by more than one witness. *See id.*[3]

### 1. Admissibility under Rule 803(6)

Blue Cross does not dispute that the documents reflect a record made at or near the time of the so-called "run date" or that RIMEC kept such records in the course of its regularly conducted business activities. Thus, Blue Cross's argument that the printouts did not satisfy Rule 803(6) is based solely on its contention that the documents lacked circumstantial guarantees of trustworthiness.

Blue Cross contends that no evidence was presented of RIMEC's use of or reliance on the documents and that because it does not appear that the documents were disseminated widely, there could be no assumption that inaccuracies contained in them would have been detected and cured. Further, Blue Cross argues that no evidence was presented to suggest that RIMEC's software ever was "calibrated or

---

3. For example, we determined in *State v. Calenda*, 787 A.2d 1195, 1200 (R.I.2002), that the trial justice did not err in admitting computer printouts when a party testified that such records were created by one of his employees, that the printout was a record kept in the normal course of his business, and when, additionally, evidence was provided by another witness about the time when the document was created.

otherwise coordinated to assure that it was compatible with Blue Cross's data files." Additionally, Blue Cross points to the fact that these printouts comprise an incomplete record; Mr. Koch testified that one such report was created each month over the course of the parties' five-year relationship, yet RIMEC produced only twenty of the more recent reports. Finally, Blue Cross draws attention to some mathematical errors in the documents themselves.

Rule 803(6) provides that a business record should not be admitted if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." However, a determination of whether an out-of-court statement meets an exception to the hearsay rule is within the trial justice's discretion. *See Ferrell v. Wall*, 889 A.2d 177, 188 (R.I.2005). We will not overturn a trial justice's decision in this regard unless it was an abuse of discretion. *Id.* In the case at bar, we are convinced that there was evidence from which the trial justice could have concluded that the documents carried circumstantial guarantees of trustworthiness, and, thus, he did not abuse his discretion.

It should be noted that RIMEC necessarily relied on the accuracy of its computer system in performing the contract at issue. In order to determine who was eligible for the services RIMEC provided, employees of RIMEC regularly consulted the computer system that created the membership data reports, and there is no indication by Blue Cross that RIMEC made services available for individuals who were not Healthcare 2000 subscribers. The business-records exception is partially "premised on the unusual reliability of records supplied by * * * a business's reli-

ance on the precision of records created through regular habits." *Fondedile S.A.*, 610 A.2d at 94.

Further, a party does not need to prove that business records are entirely accurate before they are admitted as evidence. *See United States v. McGill*, 953 F.2d 10, 15 (1st Cir.1992).[4] "The mere fact that errors or deviations have occurred from time to time does not destroy the inference of underlying trustworthiness which a judge may choose to draw from proof of a general practice." *Id.* If this were not so, "the rule would be swallowed up by an exception for less-than-perfect business practices." *United States v. Patterson*, 644 F.2d 890, 901 (1st Cir.1981). Thus, "[a]ny question as to the accuracy of the printouts, whether resulting from incorrect data entry or the operation of the computer program, as with inaccuracies in any other type of business record, would have affected only the weight of the printouts, not their admissibility." *U.S. v. Catabran*, 836 F.2d 453, 458 (9th Cir.1988). Blue Cross was permitted to question the accuracy of the printouts on cross-examination, and it did so. We also note that, in light of Mr. Koch's testimony that some of the membership data reports were accidentally destroyed or lost, the jury was given an instruction concerning spoliation of evidence. The jury nonetheless rendered a verdict in favor of RIMEC, and the trial justice did not disagree with its verdict except in regard to the amount of lost profits awarded.

Additionally, contrary to Blue Cross's contention, there was evidence that RIMEC's software was "calibrated or otherwise coordinated to assure that it was compatible with Blue Cross's data files." In fact, testimony was provided that Blue

---

4. Rule 803(6) of the Rhode Island Rules of Evidence is modeled after Rule 803(6) of the Federal Rules of Evidence, and the rules are substantially similar.

Cross employees participated in the process of making RIMEC's system compatible with Blue Cross's data. Specifically, Mr. Koch testified that employees of both RIMEC and Blue Cross had meetings during the first few months of RIMEC's operation to ensure that the companies' systems were compatible. Finally, it should be emphasized that Blue Cross's own former employee, Mr. MacArthur, determined that RIMEC's member counts were being computed accurately.[5]

Generally, under the rule, a trial justice should err on the side of admitting records and thereby allow the jury to assess the evidence's probative value. *Fondedile S.A.*, 610 A.2d at 94. We find no abuse of discretion in the trial justice's ruling. Therefore, we affirm the trial justice's decision to admit the printouts under Rule 803(6).

### 2. Admissibility under Rule 901

Blue Cross also asserts that the printouts were not properly authenticated under Rule 901. As stated above, Rule 901(a) provides that the authentication requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." This may be shown by the testimony of a witness with knowledge, but it need not be; Rule 901(b) provides examples of authentication that conform with the rule "[b]y way of illustration only, and not by way of limitation."

■ Blue Cross does not dispute that the documents are "membership data reports" as RIMEC (the proponent) claims, but rather it urges us to apply a heightened Rule 901 standard because the printouts were generated from proprietary software. Blue Cross cites Rule 901(b)(9) for the proposition that RIMEC was required to demonstrate that its computer program produced accurate results. Rule 901(b)(9), however, provides only that a document *may* be authenticated through "[e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result." Thus, under the plain language of the rule, the trial justice was under no obligation to require such a showing.

Blue Cross also cites other non-controlling authority suggesting that in some circumstances computer-related business records may require a heightened showing by the proponent to be properly authenticated. Blue Cross contends in its brief that "[t]he standard applicable to the ruling below is * * * whether RIMEC produced any evidence that the exhibits emanated from a process that reliably produced accurate results." Further, Blue Cross argues that RIMEC did not submit any evidence "that relat[ed] to the manner in which its computer software operated, or suggest[ed] that its operation produced accurate results[,]" and that therefore Rule 901 was not satisfied. Blue Cross contends "there must be 'testimony by a person with some degree of computer expertise, who has sufficient knowledge to be examined and cross-examined about the functioning of the computer.'" As such, Blue Cross maintains that the authentication requirement could have been satisfied only by the testimony of a qualified computer programmer who was familiar with the RIMEC program and could attest, based on personal investigation, that it produced accurate results.

Even if we were to accept Blue Cross's contention that a heightened standard for the authentication of documents such as those at issue in the instant case should

---

**5.** Blue Cross calls into question the validity of Mr. MacArthur's analysis, but we find its arguments unconvincing given that Blue Cross commissioned him for that very purpose.

apply, we are nevertheless satisfied that RIMEC did present evidence from which the trial justice could have concluded that the printouts satisfied their proposed Rule 901 standard. As discussed above, multiple witnesses testified about the manner in which the computer system operated, and there was evidence to suggest that the computer system generally was producing accurate results. Most notably, Blue Cross's former employee, Mr. MacArthur, who was trained in computer analysis and programming, evaluated RIMEC's computer system and concluded that it produced accurate results. Mr. MacArthur was available, as were other witnesses, to be examined and cross-examined about the functioning of the computer program. Thus, we find Blue Cross's argument to be unavailing. The trial justice did not abuse his discretion in admitting the documents into evidence at trial.[6]

## B

### Blue Cross's Motion for a New Trial Concerning Lost Profits

RIMEC maintains on appeal that the Superior Court erred in granting that portion of Blue Cross's motion for a new trial based on the jury's award of $40,434.48 for lost profits. The trial court ordered a new trial on that issue alone, unless RIMEC accepted a remittitur of the full amount awarded for lost profits.

As previously stated, RIMEC's final contract with Blue Cross was set to expire on January 31, 1998. Because Blue Cross terminated the contract on October 31,

1997, RIMEC sought a damage award for the three-month period by which the contract term was shortened. Ms. Booth was the primary witness to testify about RIMEC's claim for lost profits.

■■■■■ "One of the best ways of establishing reasonably certain future lost profits * * * is to use the operational history of the enterprise * * * or a representative portion thereof * * *." *UST Corp. v. General Road Trucking Corp.,* 783 A.2d 931, 942 (R.I.2001). Lost profits are a function of two variables: "(1) the dollar value of the contracts diverted" from the plaintiff, and (2) the plaintiff's "profit margins if it had obtained or maintained" the relevant contract. *Long v. Atlantic PBS, Inc.,* 681 A.2d 249, 252 (R.I.1996). This is consistent with the basic precept of contract law that courts should award "such measures of damage as will serve to put the injured party as close as is reasonably possible to the position he would have been in had the contract been fully performed." *George v. George F. Berkander, Inc.,* 92 R.I. 426, 430, 169 A.2d 370, 372 (1961). All damages for lost profits must be established with reasonable certainty, although actual certainty is, logically, not required for recovery of future lost profits. *Guzman v. Jan–Pro Cleaning Systems, Inc.,* 839 A.2d 504, 508 (R.I.2003); *Abbey Medical/Abbey Rents, Inc. v. Mignacca,* 471 A.2d 189, 195 (R.I.1984).

Ms. Booth's lost-profit calculation was a fairly straightforward projection based on RIMEC's 1997 federal tax return. Blue Cross does not seem to fault her general methodology. However, on cross-exami-

---

**6.** Blue Cross also argues that the Superior Court erred by conflating the "trustworthiness" analysis under Rule 803(6) and the authenticity analysis under Rule 901 of the Rhode Island Rules of Evidence, specifically citing the trial justice's statement that "the [Rule] 901 requirement partakes to a very great extent the trustworthiness element found in [Rule] 803(6), and this Court is satisfied that at least the minimum requirements for admission of these records here has been established." We are satisfied, however, that the trial justice adequately considered the requirements of each rule in ruling on the admissibility of the documents.

nation, Blue Cross exposed an error in Ms. Booth's analysis.

As explained previously, Ms. Booth's analysis began with RIMEC's net income for 1997 of $68,981. It was her assumption that this number was based exclusively on the net receipts from Blue Cross for January 1997 through October 1997. Ms. Booth acknowledged that if some income included in that amount was attributable to another period, it would render her projection inaccurate.

Mr. Koch testified that RIMEC's gross revenue for 1997 included a reconciliation payment of $223,003, paid by Blue Cross in 1998,[7] for past underpayments of monthly capitation fees.[8] This reconciliation payment reflected amounts due for all five years Blue Cross and RIMEC did business together. Specifically, $51,127.99 was attributable to underpayment for services in 1993, $22,806.83 was attributable to 1994, $57,849.72 was attributable to 1995, and $27,189.02 was attributable to 1996. Only $64,029.38 was attributable to work RIMEC performed in 1997. Stated differently, $158,973.56 was unrelated to RIMEC's operations in 1997. If RIMEC's net profit had been adjusted to reflect this figure, RIMEC actually would have reported a net loss of $89,992.56 in 1997.

RIMEC's argues that the jury was entitled to base its decision on Ms. Booth's calculation of lost profits despite this error because mathematical certainty is not required when projecting future damages. RIMEC points out that Ms. Booth's estimate was a figure based on a representative portion of RIMEC's operational history, which is a valid basis for predicting lost profits. Further, RIMEC contends assumptions were required and Ms. Booth's opinion rested upon reasonable assumptions. RIMEC also contends that because Blue Cross's wrongful conduct rendered the ascertainment of the precise damages suffered by RIMEC difficult, Blue Cross should not be entitled to complain that RIMEC's damages were not measured as precisely as they otherwise could have been.

■■■■■ "[W]e accord great weight to a trial justice's decision on a motion for a new trial." *Oliveira v. Jacobson,* 846 A.2d 822, 826 (R.I.2004). A trial justice acts as a "superjuror" when ruling on such a motion. *Franco v. Latina,* 840 A.2d 1110, 1111 (R.I.2004). In this role, "the trial justice should review the evidence and exercise his or her independent judgment 'in passing upon the weight of the evidence and the credibility of the witnesses.'" *Id.* (quoting *Martinelli v. Hopkins,* 787 A.2d 1158, 1165 (R.I.2001)). We will not overturn a trial justice's decision in this regard "unless the trial justice overlooked or misconceived the evidence or otherwise was clearly wrong." *Id.* at 1112. We are satisfied that such is not the case under the instant facts.

■■■ RIMEC alternatively requests a reasonable opportunity to accept the Superior Court's remittitur mandate.[9] Upon remand, we direct that RIMEC be afforded a ten-day period within which to comply with the remittitur mandate. *See DeLeo v. Anthony A. Nunes, Inc.,* 546 A.2d 1344, 1348 (R.I.1988) (denying the plaintiffs' appeal from a reduced damage award, but allowing the plaintiffs to accept or reject a

---

7. Mr. Koch testified that RIMEC filed its income tax returns on an accrual basis.

8. The reconciliation payment corrected a problem unrelated to this litigation.

9. A trial justice may "conditionally correct and modify a jury award that is found to be excessive" through the mechanism of remittitur. *Cotrona v. Johnson & Wales College,* 501 A.2d 728, 733 (R.I.1985).

remittitur mandate). If there is no compliance by RIMEC, a new trial will be held limited to the issue of damages for RIMEC's claim for lost profits. *See id.*

### III

### Conclusion

For the reasons stated in this opinion, we affirm the judgment and remand the papers in the case to the Superior Court with instructions consistent with this opinion.

Justice FLAHERTY did not participate.