**Supreme Court**

No. 2012-87-Appeal.
(NC 07-238)
(Dissent begins on page 21)

Jennifer O'Connor                          :

            v.                             :

Newport Hospital et al.                    :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2012-87-Appeal.
(NC 07-238)
(Dissent begins on page 21)

Jennifer O'Connor                          :

v.                          :

Newport Hospital et al.                :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** After a three-week trial, a jury returned a verdict in favor of the defendants, Newport Hospital (hospital), Gita S. Pensa, M.D., and Newport Emergency Physicians, Inc. (NEP) (collectively defendants), in this medical malpractice action. The plaintiff, Jennifer O'Connor, appeals from the Superior Court judgment, claiming that the trial justice's erroneous admission into evidence of three documents during the voir dire of the plaintiff's standard-of-care expert, exacerbated by an allegedly "biased and incorrect" jury verdict form, was sufficiently prejudicial to warrant a new trial. We agree, and accordingly we vacate the judgment and remand the case for a new trial.

### I

### Facts and Procedural History

On June 22, 2006, at the age of thirty-one, O'Connor underwent cervical disk replacement surgery at Rhode Island Hospital; she was discharged from the hospital two days later. In the early morning hours of June 26, 2006, O'Connor experienced a pain behind her right eye "unlike anything that [she] had ever felt before." She testified that "it [was as] if

someone took an ice pick and stuck it through the eye and it hit the point right behind your eye * * *." O'Connor also testified that she experienced numbness around her mouth, confusion, and the sensation of being hot and cold at the same time. O'Connor was transported to Newport Hospital by ambulance, at which time she also experienced nausea and sensitivity when her eye was exposed to light.

At Newport Hospital, O'Connor was treated by Dr. Pensa. According to O'Connor, Dr. Pensa thought she had an eye problem or perhaps a migraine headache. O'Connor was admitted, but a couple of hours later she was discharged from the hospital, and she returned home. Later that morning, she awoke with worsening symptoms and was driven to Rhode Island Hospital, where she was joined by the surgeon who had performed the disk replacement surgery. O'Connor learned she was having a stroke caused by a vertebral artery dissection. She testified that, after the stroke, she experienced the loss of motor skills on her right side, but that she regained function through therapy. She also testified that she continues to have chronic, debilitating nerve pain, issues with her balance, and difficulty coming up with the correct words while speaking.

On March 6, 2007, O'Connor filed suit in Superior Court against defendants, alleging negligence and lack of informed consent.[1] On May 12, 2011, Dr. Pensa and NEP filed a pretrial motion to preclude the testimony of Eddy Lang, M.D., one of plaintiff's disclosed experts on the standard of care. At the hearing on the motion, Dr. Pensa and NEP's counsel argued that Dr. Lang was not qualified to testify as an expert on the standard of care in American emergency rooms because he was a Canadian physician who was neither board-certified nor licensed to

---

[1] In plaintiff's initial complaint, she also named Lifespan (partner to Newport Hospital) and Christine Gill, M.D. (who allegedly treated plaintiff) as defendants. The claims against these defendants, however, were dismissed by stipulation before trial.

practice medicine in the United States.  The trial justice denied the motion without prejudice, noting that "plaintiffs are at their peril * * * if the defendants are able to impeach the expert's credibility either on issues of experience, training, education, etc."  Towards the beginning of trial testimony, a voir dire of Dr. Lang was conducted in the presence of the jury.  Doctor Lang testified that he was familiar with the standard of care required of emergency-room physicians in the United States, and he also stated that there was no difference between the standard required in the United States and that required in Canada.

Counsel for Dr. Pensa and NEP cross-examined Dr. Lang regarding his qualifications and elicited the fact that, although he is a practicing emergency-medicine physician in Canada and is certified as an emergency-medicine specialist in the provinces of Québec and Alberta, he has neither sought, nor received, a license to practice medicine in the United States.  The following colloquy took place regarding Dr. Lang's eligibility for board certification in the United States:

> "Q And in fact, when I asked you at your deposition as to whether or not you knew if you were even eligible to sit for board certification in the United States with the American Board of Emergency Medicine, you thought you were able to, correct?
> " * * *
> "A I think I was uncertain as to whether I was able to.
> "Q * * * You were uncertain or you believed that you were eligible?
> "A I believed I was eligible.
> "Q Okay.  You believed you were eligible.  In fact, you're not eligible to even sit for board certification with the American Board of Emergency Medicine, correct?
> " * * *
> "A I still do not know for certain whether I would be eligible or not.
> "Q Well, okay.  And have you taken time to look at the American Board of Emergency Medicine at their website to even see if you are eligible?
> " * * *
> "A I have not."

Following this exchange, Dr. Pensa and NEP offered three exhibits purporting to relate to the policies of the American Board of Emergency Medicine (ABEM).[2] Exhibit A reflected a printed version of a web page that purported to outline the ABEM's policies on training requirements. Exhibit B was also a printed version of what appeared to be an ABEM web page, stating that, in Canada, the Royal Association of Physicians and Surgeons of Canada (RAPSC) reviews and accredits Canadian residency programs.[3] Finally, exhibit C purported to reflect a printed version of an email from the Associate Executive Director of the Academic and Board Relations section of the ABEM. The printed version of the email stated that training through the College of Family Physicians of Canada (CFPC) did not fulfill the ABEM's eligibility requirements. All three documents were admitted as full exhibits over plaintiff's objections. At the conclusion of the voir dire and over defendants' objections, the trial justice ruled that Dr. Lang was qualified to provide expert testimony on the standard of care and causation.

After a three-week trial, the jury returned a verdict in defendants' favor on June 14, 2011, finding that plaintiff had failed to prove by a preponderance of the evidence that Dr. Pensa had breached the standard of care. In her appeal of the final judgment, plaintiff argues that: (1) the trial justice erred by admitting exhibits A-C during Dr. Lang's voir dire; (2) the trial justice erred by including the language "physician practicing in the United States at a community hospital" in question one of the jury verdict form; and (3) that these errors sufficiently prejudiced plaintiff to warrant a new trial. This case initially came before us pursuant to an order directing the parties to show cause why the issues raised in this appeal should not be summarily decided. After oral

---

[2] The trial exhibits were not submitted with the record on appeal. The descriptions of the content of exhibits A-C were taken from the testimony at trial and from photocopies of the documents that were provided in plaintiff's appendices.

[3] Doctor Lang trained under the College of Family Physicians of Canada.

- 4 -

argument, however, we concluded that this Court would benefit from additional briefing and argument, and we reassigned this case to the full argument calendar.

## II

## Standard of Review

"It is well established that 'the admissibility of evidence is within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent.'" Notarantonio v. Notarantonio, 941 A.2d 138, 149 (R.I. 2008) (quoting DiPetrillo v. Dow Chemical Co., 729 A.2d 677, 690 (R.I. 1999)). When the complaining party can show that the trial justice abused his or her discretion, we will reverse the ruling only if the abuse of discretion resulted in prejudice to the complaining party. State v. Martin, 68 A.3d 467, 475 (R.I. 2013).

## III

## Discussion

## A

## The Exhibits

## 1. Authentication

The plaintiff first argues that the trial justice abused his discretion by admitting exhibits A-C because none of them was properly authenticated. She contends that Dr. Lang, the only witness to whom questions were posed regarding these documents, was not capable of authenticating them simply by reciting some of the information contained therein. She also contends that these three documents were neither self-authenticating nor subject to judicial notice.

Doctor Pensa and NEP first argue that plaintiff failed to properly preserve her authentication objections to exhibits A and B because plaintiff interposed only a general objection to their admission and did not specify lack of authentication as a ground thereof. To effectively preserve an issue for appeal, a litigant's objection must be "sufficiently focused so as to call the trial justice's attention to the basis for said objection." State v. Brown, 9 A.3d 1240, 1245 (R.I. 2010) (quoting State v. Warren, 624 A.2d 841, 842 (R.I. 1993)). The entire discussion after defendants moved to admit exhibits A and B in full was as follows:

> "[DEFENSE COUNSEL]: By the way, at this time if I may I would ask that A and B be full.
> "[PLAINTIFF'S COUNSEL]: Objection.
> "THE COURT: Grounds?
> "[PLAINTIFF'S COUNSEL]: Foundation, admissibility and hearsay.
> "THE COURT: Overruled. It may be marked as full."

Rule 901(a) of the Rhode Island Rules of Evidence is clear that authentication is a "condition precedent to admissibility." We are satisfied that plaintiff's use of the words "foundation" and "admissibility" sufficiently "call[ed] the trial justice's attention" to the threshold issue of authentication. See Brown, 9 A.3d at 1245 (quoting Warren, 624 A.2d at 842). The plaintiff's argument that none of the three documents was properly authenticated prior to admission as full exhibits, therefore, was properly preserved for our review.

The hospital argues that plaintiff was on notice that defendants intended to use these exhibits to challenge Dr. Lang's qualifications during the trial because defendants' pretrial motion in limine to preclude Dr. Lang's expert testimony referred to these three documents and included each as an appendix to the motion. Doctor Pensa and NEP contend that plaintiff did not challenge the accuracy of the information contained within the three documents during the trial. Furthermore, all defendants assert that Dr. Lang's acknowledgement of the purported content of

- 6 -

the documents, coupled with the "inherent reliability" of the ABEM website, was sufficient for purposes of authentication.

Rule 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The advisory committee's note to Rule 901 informs that "authentication and identification are regarded as a special aspect of relevancy"; evidence is relevant only if it is in fact what the party seeking its admission claims it to be. "[T]he burden of proof for authentication[,] [however,] is slight." United States v. Reilly, 33 F.3d 1396, 1404 (3d Cir. 1994) (quoting Link v. Mercedes-Benz of North America, Inc., 788 F.2d 918, 927 (3d Cir. 1986)). To that end, we recently stated that "[a]uthentication is not a high hurdle to clear." McGovern v. Bank of America, N.A., 91 A.3d 853, 860 (R.I. 2014). "This Court has taken a flexible and pragmatic approach to Rule 901 by allowing 'a document's authenticity [to] be established in any number of different ways.'" McGovern, 91 A.3d at 860 (quoting Rhode Island Managed Eye Care, Inc. v. Blue Cross & Blue Shield of Rhode Island, 996 A.2d 684, 691 (R.I. 2010)). We have previously held that "document authenticity need not be established by any particular means * * * [but] may be accomplished by any of the methods enumerated in Rule[s] 901 or 902."[4] State v. Oliveira, 774 A.2d 893, 925 (R.I. 2001) (quoting Superior Boiler Works, Inc. v. R.J. Sanders, Inc., 711 A.2d 628, 632 n.3 (R.I. 1998)). "In making Rule 901 determinations, trial justices must decide whether there is enough support in the record to conclude that it is 'reasonably probable' that the evidence is what its offeror [pro]claims it to be. * * * If so, then the evidence's suasive force is for the jury to decide." Id. at

---

[4] Rule 901(b) of the Rhode Island Rules of Evidence sets forth, "[b]y way of illustration only, and not by way of limitation," a non-exclusive list of ways to authenticate evidence; Rule 902 of the Rhode Island Rules of Evidence lists documents that are self-authenticating.

926 (quoting State v. Griffin, 691 A.2d 556, 558 (R.I. 1997)). Thus, a trial justice "need not find that the evidence is necessarily what the proponent claims, but only that there is sufficient evidence that the jury ultimately might do so." United States v. Safavian, 435 F.Supp.2d 36, 38 (D.D.C. 2006); see 31 Federal Practice and Procedure: Evidence § 7102.

The issue of authentication of documents printed directly from either an Internet website or an email account is a matter of first impression in Rhode Island. While Rule 901(b) provides several illustrations of how to properly authenticate various kinds of evidence, none of the illustrations provided therein includes either documents printed from pages located on the Internet or from email accounts. Although a proponent of evidence need not meet a particularly high standard for an authenticity determination, defendants in this case undoubtedly have failed to cross even the most minimal of thresholds. We address the contested documents in turn.

### a. Web Pages

Exhibits A and B consist of printouts of web pages purportedly printed from the ABEM website. One commentary on Rule 901 of the Federal Rules of Evidence, which essentially mirrors Rule 901 of the Rhode Island Rules of Evidence,[5] suggests that:

> "To authenticate a printout of a web page, the proponent must offer evidence that: (1) the printout accurately reflects the computer image of the web page as of a specified date; (2) the website where the posting appears is owned or controlled by a particular person or entity; and (3) the authorship of the web posting is reasonably attributable to that person or entity. Evidence that may corroborate these points could include testimony of others who saw the posting on the website, continuation of the posting on the website so that it is available to be seen by the court, or

---

[5] When, as here, the Rhode Island rule is substantially similar to the federal rule, we often look to federal courts' decisions for guidance and interpretation. Miller v. Metropolitan Property and Casualty Insurance Co., 88 A.3d 1157, 1161 (R.I. 2014); Greensleeves, Inc. v. Smiley, 942 A.2d 284, 290 (R.I. 2007); Crowe Countryside Realty Associates, Co., LLC v. Novare Engineers, Inc., 891 A.2d 838, 840 (R.I. 2006). We find federal treatises to be similarly instructive.

> evidence that the party to whom the posting is attributed made similar postings or published the same information elsewhere." Christopher B. Mueller and Laird C. Kirkpatrick, 5 <u>Federal Evidence</u> § 9:9 (4th ed.) (database updated May 2014).

Here, there is no indication on the record that Dr. Pensa and NEP's counsel made any representations to the trial justice regarding when or by whom the documents reflected in exhibits A and B were accessed and printed from the ABEM website. Counsel did not offer, by affidavit or otherwise, a witness to confirm that the exhibits in question accurately reflected what the witness saw after he or she logged onto the ABEM website. Instead, defendants attempted to admit the exhibits through the testimony of Dr. Lang himself by merely showing him the documents and asking him if it was "something taken directly off a public website."

It is clear from the record that counsel simply asked Dr. Lang a few leading questions about the content of the documents, the answers to which were based on Dr. Lang's cursory review of the documents in the moments prior to the posing of the questions. Alternatively, defendants could have provided a witness with personal knowledge to testify to the source of the exhibits. <u>See</u> <u>United States v. Bansal</u>, 663 F.3d 634, 667 (3d Cir. 2011) (holding that screenshots from a website were properly authenticated when the proponent of the evidence called a witness who explained the website's archive process and testified, based on personal knowledge, that the screenshots were authentic); <u>United States v. Jackson</u>, 208 F.3d 633, 638 (7th Cir. 2000) (affirming a trial justice's exclusion of web postings on the basis of lack of authentication because the defendant had not shown that the postings were actually created by the group that the defendant claimed). Another option would have been to obtain a copy of the policies and guidelines purportedly contained within exhibits A and B that had been either certified by the keeper of records at ABEM, or attached to an affidavit that attested to the accuracy of the copies.

McCormick on Evidence states that "[p]rintouts of [w]eb pages must first be authenticated as accurately reflecting the content of the page and the image of the page on the computer at which the printout was made. Testimony of a percipient witness, even the trial judge, can testify to such accuracy." 2 Kenneth S. Broun et al., McCormick on Evidence § 227 at 74 (6th ed. 2006). Here, the trial justice did not make any comments or findings with respect to authentication of any of the documents in overruling plaintiff's objections to the exhibits. It is our considered opinion that insufficient evidence was proffered to support the authenticity of the two printouts of the ABEM web pages and that, accordingly, the admission of exhibits A and B into evidence was clearly erroneous.

### b. Email

Exhibit C is a printout of a purported email from the Associate Executive Director of the Academic and Board Relations section of the ABEM to "K. Lafontaine." Doctor Lang was asked questions about the contents of the email, and it was admitted into evidence without any attempt on the record to verify its authenticity. Doctor Lang simply answered the questions about the identity of the sender of the email and the message contained therein—answers that were based on his reading of the email to himself at counsel's request during the few moments before the questions were asked. There was no indication that Dr. Lang had previously seen this email, or that he had any familiarity with either the sender or recipient of the email.

Clearly, an email, like any other item of evidence, may be authenticated in any number of different ways, by either direct or circumstantial evidence. Perhaps the most direct method would be through the testimony of a witness with personal knowledge that the proffered exhibit is what it is claimed to be, such as the author or recipient of the email. See Rule 901(b)(1). Additionally, Rule 901(b)(4) provides for a variety of ways that an email might be authenticated

by circumstantial evidence, including "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." If an email is not clearly identifiable on its own, and if there is no witness with personal knowledge, a forensic expert witness might be able to trace an email back to the Internet address from which it originated. As one well-respected treatise on evidence instructs:

> "E-mails can be authenticated by their authorship. The electronic signature that they bear may not be sufficient, however, because of the risk of manipulation of e-mail headers.[] Additional data such as the address that an e-mail bears, the use of the 'reply' function to generate the address of the original sender, the content of the information included in the e-mail and other circumstances, can suffice." 2 Kenneth S. Broun, § 227 at 73.

Here, Dr. Lang was neither the sender nor the recipient of the email. Doctor Lang's mere recitation of the identity of the purported sender of the email and summary of its message (viz., that one with Dr. Lang's credentials would not be eligible for board certification by the ABEM) was insufficient to authenticate the email. Moreover, the record is silent as to any distinctive features of the email that would support its authentication, and our review of exhibit C does not reveal any characteristic that would authenticate it as an email sent from a representative of ABEM.

While we have not set a "high hurdle to clear" with respect to authentication, McGovern, 91 A.3d at 860, we hold that the trial justice abused his discretion by admitting exhibits A-C based solely on the brief testimony of one witness who was clearly unfamiliar with all three documents.

## 2. Hearsay

The plaintiff next argues that the exhibits were "textbook hearsay documents," offered for the truth that Dr. Lang was ineligible for board certification in the United States. The

- 11 -

plaintiff contends that the trial justice erred by not requiring defendants to provide an applicable hearsay exception as well as by not making any findings with respect to the hearsay objections other than to summarily overrule them. "Hearsay is defined in Rule 801(c) of the Rhode Island Rules of Evidence as 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" Martin, 68 A.3d at 475 (quoting Rule 801(c)). Hearsay statements are inadmissible except as provided by law. Rule 802 of the Rhode Island Rules of Evidence. Here, the trial justice summarily overruled plaintiff's hearsay objections without requiring either a response from defendants or further argument from plaintiff regarding the specific grounds for her hearsay objections. The three documents entered into evidence as exhibits A-C were unquestionably hearsay. Exhibits A and B were clearly offered to prove ABEM's eligibility standards for board certification. Exhibit C was offered to establish that Dr. Lang's training under the CFPC does not meet ABEM's eligibility requirements.

Doctor Pensa and NEP contend that "[t]he challenged evidence carries the necessary imprimatur of reliability and inherent trustworthiness necessary to meet the 'catch-all' exception to the hearsay rule." With respect to exhibits A and B, Dr. Pensa and NEP argue that each would qualify under Rule 803(24) of the Rhode Island Rules of Evidence because the documents are from an official website and not a blog or comment section to an online article. The hospital, for its part, contends that "[t]he URL address, date of printing, email addresses and date and time of transmittal, coupled with counsel's representations, provide adequate circumstantial guarantees of trustworthiness to permit the admission of these documents into evidence."

Rule 803(24)—known colloquially as the "catch-all" exception—allows for the admission of hearsay statements that, while not covered by any of the other hearsay exceptions,

have "equivalent circumstantial guarantees of trustworthiness."  In order for the evidence to be admissible, the trial justice must determine that:

> "(A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of [the Rhode Island Rules of Evidence] and the interests of justice will best be served by admission of the statement into evidence." Rule 803(24).

We have said, however, that this "residual exception is 'meant to be reserved for exceptional cases' and is 'not intended to confer a broad license on trial judges to admit hearsay statements that do not fall within one of the other exceptions * * * .'" In re Steven D., 23 A.3d 1138, 1165 (R.I. 2011) (quoting Conoco Inc. v. Department of Energy, 99 F.3d 387, 392 (Fed. Cir. 1996)).

In the case under review, we decline defendants' invitation to hold that the exhibits were properly admitted under the catch-all exception to the hearsay rule.  The trial justice did not make any of the requisite findings concerning admissibility under Rule 803(24), nor do we discern from the record such exceptional circumstances as would warrant the admission of exhibits A-C.  We are satisfied, therefore, that all three documents were erroneously admitted in violation of Rule 802.

### 3.  Extrinsic Evidence of Character and Conduct

The plaintiff also argues that exhibits A-C were extrinsic evidence admitted in violation of Rule 608(b) of the Rhode Island Rules of Evidence.  The plaintiff contends that defendants were trying to prove that Dr. Lang was not eligible to become board-certified in emergency medicine by the ABEM, a collateral and extraneous point given Dr. Lang's admission prior to the introduction of these documents that he was not board-certified to practice emergency medicine in the United States.  The plaintiff, however, raises a Rule 608(b) challenge for the first time on appeal, and plaintiff's objections to the exhibits on the grounds of foundation,

admissibility, authentication, and hearsay were insufficient to call the trial justice's attention to Rule 608(b). See Brown, 9 A.3d at 1245. In addition, we have stated that, if "the introduction of evidence is objected to for a specific reason, other grounds for objection are waived and may not be raised for the first time on appeal." Robideau v. Cosentino, 47 A.3d 338, 341 (R.I. 2012) (mem.) (quoting In re Jazlyn P., 31 A.3d 1273, 1280-81 (R.I. 2011)). Accordingly, we find this argument to be waived.

**B**

**Prejudice**

The plaintiff argues that the admission of the three documents was sufficiently prejudicial to warrant a new trial, and also that the prejudice was intensified by defendants' repeated references to Dr. Lang's nationality and his ostensible inability to become board-certified in the United States,[6] as well as by the wording of the first question on the jury verdict form. She contends that defendants' goal was to suggest that Dr. Lang was "untrustworthy because he supposedly could not practice in a United States emergency room," and that this suggestion was powerful, "extremely damaging and unquestionably prejudicial." The plaintiff further asserts that "[t]he expert's outsized importance suggests that the introduction of any inadmissible evidence intended to influence the jury's consideration of an expert's opinion can have an overwhelming impact on the jury verdict."

The hospital contends that, even if the three exhibits were admitted in error, the error was not unfairly prejudicial because "the question of board certification was a very small piece of the overall attack on [plaintiff's] expert's qualifications." The defendants also assert that the trial

---

[6] Doctor Pensa and NEP's counsel incorporated the phrase "board certified emergency medicine physician practicing in the United States" into four questions posed to defendants' own standard-of-care expert during the direct examination and referred to Dr. Lang's nationality and lack of American credentials during his closing argument.

justice issued an instruction to the jury clarifying that: (1) the purpose of the testimony relating to exhibits A-C was to impeach the doctor's testimony regarding his qualifications; and (2) as trial justice, it was his decision whether Dr. Lang had the necessary qualifications to testify as an expert. Doctor Pensa and NEP argue that this limiting instruction, although given in the context of testimony regarding a fourth exhibit (exhibit D, a document not challenged on appeal), was "sufficient to obviate any perceived prejudice as to the other challenged exhibits, which also addressed [Dr. Lang's] qualification[s] to testify as an expert." The plaintiff replies that the trial justice's cautionary instruction applied to exhibit D only and that it did not serve to "reduce the impact these three inadmissible, hearsay documents had on the jury's deliberations."

After exhibits A-C were admitted in full, Dr. Pensa and NEP's counsel questioned Dr. Lang about exhibit D, which purported to contain guidelines set forth by the American College of Emergency Physicians as to how its members may qualify to serve as expert witnesses in the area of emergency medicine. At the conclusion of the discussion regarding exhibit D, the trial justice directed the following instruction to the jury:

> "Ladies and gentlemen, I just should say that the purpose of that line of questioning was to try to impeach the doctor's testimony as far as his qualifications, specifically, his affiliation with the journal -- the American Annals or the Annals of Emergency Medicine which is a publication of this particular organization. It's not to say what qualifies an expert, particularly in this particular case to testify -- a physician to testify as an expert in the area of emergency medicine. That's my call. They don't get to decide that just because they say this is what you should be to testify. That doesn't mean that it's binding on me. So it's simply offered for that limited purpose and I should let you know that."

We agree with plaintiff that this instruction pertained only to exhibit D. However, even if the jurors considered the instruction in light of the entire voir dire cross-examination, the weight that

they ultimately gave to Dr. Lang's testimony may nevertheless have been overly influenced by the improperly admitted evidence.

In Marley v. Providence Journal Co., 86 R.I. 229, 238, 134 A.2d 180, 184 (1957), we stated that "not every admission of improper evidence entitles an adverse party to a new trial * * * [b]ut if it appears that the evidence objected to was material, in the sense that it probably influenced the verdict, the verdict should be set aside." We have also explained:

> "No rule of thumb will provide us with the answer, and there is no bench mark against which possible prejudicial effect may be measured. Instead, prejudicial effect, if it exists, must be found in an examination of the substance of the evidence and of the facts attendant upon its admission, and in an evaluation of its probable effect upon the outcome of the case." Heuser v. Goldstein, 107 R.I. 317, 322, 267 A.2d 420, 422 (1970).

The ultimate test is "whether [the improperly admitted evidence] reasonably tended to exert an influence upon the determination of the real issue in the case." Bailey v. Huling, 119 R.I. 250, 255, 377 A.2d 220, 223 (1977) (quoting Heuser, 107 R.I. at 321, 267 A.2d at 422).

The trial in this case lasted three weeks and the record spans fifteen volumes of transcripts. The plaintiff offered only one expert witness to testify regarding the standard of care and Dr. Pensa's alleged breach of that standard. The defendants vigorously attacked that expert's qualifications and credibility, both in questioning their own expert and when making their final effort to persuade the jury during their closing argument. We agree with plaintiff that a medical expert plays a "pivotal role" with respect to meeting the burden of proof in a medical malpractice case. The weight to be ascribed to Dr. Lang's testimony was the central issue in this case because the entire cause of action hinged on whether the jury found that the treatment provided to plaintiff by Dr. Pensa met the standard of care. As defendants accurately state, however, the evidence elicited from exhibits A-C was merely cumulative of information that was

- 16 -

already on the record through the testimony of Dr. Lang. Prior to the introduction of the exhibits, Dr. Lang had already acknowledged that he was not board-certified in the United States, that he had never sought to be board-certified in the United States, and that he did not know whether he was eligible to be board-certified in the United States.

The plaintiff contends, however, that not only was the admission of exhibits A-C sufficiently prejudicial on its own to warrant a new trial, but that the extent to which these three documents prejudiced her case was exacerbated by the improper wording of question one on the jury verdict form. The plaintiff proposed the following language for the first question: "Do you find by a fair preponderance of the evidence that Defendant Gita S. Pensa, M.D. was negligent in her care and treatment of Jennifer O'Connor at Newport Hospital on June 26, 2006?" The trial justice, however, phrased the question in a manner that was substantially similar to the question proposed by defendants:

> "Did the Plaintiff, Jennifer O'Connor, prove by a preponderance of the evidence that the Defendant, Gita S. Pensa, M.D., breached the standard of care for an emergency medicine physician practicing in the United States at a community hospital on June 26, 2006 in her care and treatment of Jennifer O'Connor?"

The plaintiff objected to the wording of this question; she contends that it was biased and incorrect, and "reinforced the crux of [defendants'] criticism of Dr. Lang and the import of the three improperly admitted documents."

Doctor Pensa and NEP argue that any issue regarding the phrasing of the question may not be properly preserved for appeal because the record shows that plaintiff agreed to the question after discussions off the record with the trial justice. A review of the record reveals that, towards the end of the jury instructions and after the trial justice had read the verdict form to the jury, the trial justice held a sidebar conference with counsel on the record. Most of the

- 17 -

sidebar discussion is not pertinent to the issues on appeal, but plaintiff's counsel did begin the discussion with the following:

> "[Y]our Honor, just briefly under Question 1, the phrase practicing in the United States in a community hospital, the question is whether she breached obviously the national standard of care but the practicing, United States, community hospital incorporates the defendant's argument under the second question of the jury verdict form."

The plaintiff's counsel then proceeded to discuss his issues with questions two through four of the verdict form. The trial justice responded with: "Well, frankly, I thought we discussed Question 1 which I thought we were in agreement on." It is our opinion that plaintiff's comment regarding question one during the sidebar conference was sufficient to preserve her objection for our review.

The defendants contend that the verdict form question was appropriate because it reflected this Court's adoption of a national standard of care in Sheeley v. Memorial Hospital, 710 A.2d 161 (R.I. 1998). In Sheeley, we rejected the "similar locality" rule in favor of a national standard for expert witnesses in cases of medical malpractice. Id. at 166, 167. The trial justice in Sheeley had excluded the testimony of a board-certified obstetrician from New York whose expert testimony was offered regarding the standard of care for a second-year family-practice resident in Rhode Island—testimony that was potentially inappropriate under the "similar locality" rule. Id. at 163, 164. Although defendants are correct that Sheeley heralded our adoption of a national standard of care, they overlook the fact that Sheeley also liberalized our view of expert testimony considerably. In adopting the more liberal standard, this Court stated that "whatever geographical impediments may previously have justified the need for a 'similar locality' analysis are no longer applicable in view of the present-day realities of the

medical profession." Id. at 166.  This Court then went on to quote a Maryland decision that explained why the similar locality rule was outdated:

> "[T]he medical schools of yesterday could not possibly compare with the accredited institutions of today, many of which are associated with teaching hospitals.  But the contrast merely begins at that point in the medical career: vastly superior postgraduate training, the dynamic impact of modern communications and transportation, the proliferation of medical literature, frequent seminars and conferences on a variety of professional subjects, and the growing availability of modern clinical facilities are but some of the developments in the medical profession which combine to produce contemporary standards that are not only much higher than they were just a few short years ago, but are also national in scope." Id. (quoting Shilkret v. Annapolis Emergency Hospital Association, 349 A.2d 245, 252 (Md. 1975)).

The plaintiff ascribes error to the following language in the jury verdict form: "practicing in the United States at a community hospital."  With respect to the phrase "at a community hospital," she argues that the "language is nearly identical to language that was disapproved by this Court in Carlson v. Gillie, 723 A.2d 801, 802 (R.I. 1998) [(mem.)] and in [Sheeley, 710 A.2d at 166-67]."  The offending language in Carlson was a statement by the trial justice that "[t]he standard is a community standard.  The community is Westerly.  The community in which Dr. Gillie practices in Westerly [sic]." Carlson, 723 A.2d at 802.  It is our opinion, however, that such language is fundamentally different from the jury verdict form in the case under review. The mere reference to a "community hospital" does not evoke the "same or similar locality standard" that we rejected in Sheeley and Carlson.  See id.; Sheeley, 710 A.2d at 166-67. Moreover, it can hardly be argued that the phrase "practicing in the United States" does not reflect a national standard.

Nevertheless, while the language in the first question on the jury verdict form might pass muster in another medical malpractice case, we must, however, assess its potential prejudice in

light of the circumstances of this case. In so doing, we conclude that the jury verdict form highlighted information contained in exhibits A-C and contributed to the prejudicial effect of those erroneously admitted documents. The phrase "practicing in the United States" certainly draws attention to the fact that Dr. Lang was not board-certified in the United States. We are mindful that, even though Dr. Lang testified that he was not board-certified and was uncertain about his eligibility, it was the email and two web pages, introduced as full exhibits, that were available to the jury during its deliberations. We conclude, therefore, that these improperly admitted documents probably influenced the jury's verdict. See Marley, 86 R.I. at 238, 134 A.2d at 184.

Considering all three exhibits admitted in error and the wording of question one on the verdict form, there is, in our opinion, sufficient prejudice to warrant a new trial. The improperly admitted documents could reasonably have influenced the jury's determination of the central issue in this case, and the jury could have been misled into lending more weight to Dr. Lang's nationality than appropriate, resulting in prejudice to the plaintiff. See Bailey, 119 R.I. at 255, 377 A.2d at 223; Heuser, 107 R.I. at 321, 267 A.2d at 422. We hold that the improper admission of the three exhibits "ha[d] a natural tendency to affect the fairmindedness of the jury," resulting in a prejudicial error that "only a new trial can cure." Bruyere v. Castellucci, 98 R.I. 129, 138, 200 A.2d 226, 231 (1964).

## IV

### Conclusion

For the reasons stated herein, we vacate the judgment of the Superior Court and remand this case for a new trial. The record of this case shall be returned to the Superior Court.

**Justice Indeglia, dissenting.**  While I agree with my colleagues in the majority that the three documents[1] introduced into evidence may have been improperly admitted, I remain convinced that they were cumulative in nature and any error in their admission, at most, was harmless.  See Now Courier, LLC v. Better Carrier Corp., 965 A.2d 429, 435 (R.I. 2009) (noting that the admission of otherwise inadmissible evidence "is harmless when the record demonstrates that it is merely cumulative of proper evidence"); Flanagan v. Wesselhoeft, 765 A.2d 1203, 1210 (R.I. 2001) (holding that "the use of unauthenticated excerpts from medical treatises and/or articles did not constitute prejudicial error in light of the totality of the evidence presented"); Maynard v. Rhode Island Hospital, 536 A.2d 532, 534 (R.I. 1988) (stating that any error in admission of evidence was "harmless" because complaining party "had already admitted" similar facts).

The plaintiff contends that the emphasis of these documents so prejudiced Dr. Lang with the jury that it could not fairly evaluate his testimony and ultimately her case.  Still, it was plaintiff who opened the gate to this information when she agreed to conduct Dr. Lang's voir dire examination before the jury to determine his qualifications as an emergency medicine expert.[2]  During plaintiff's direct examination or without objection on cross-examination, Dr. Lang revealed much of the information found in the documents.  He told the jury (1) he was not

---

[1] It is worth noting that plaintiff and the majority place dispositive significance on the impact of these three documents, yet plaintiff herself failed to ensure that certified copies of these documents were made part of the record on appeal notwithstanding the requirements of Article I, Rule 10 of the Supreme Court Rules of Appellate Procedure.

[2] At oral argument, plaintiff contended that she was faced with a Hobson's choice of employing this mechanism or being unable to have Dr. Lang complete his testimony before returning to Canada.

board-certified in emergency medicine in the United States, (2) he was not licensed to practice medicine in the United States, and (3) he never worked in the United States as a physician. Nothing in these exhibits changed those facts, especially in light of the trial justice's caution to the jury, again without objection, that the trial justice makes the determination as to the expertise of witnesses and then, shortly thereafter, instructed the jury that he found Dr. Lang qualified as an expert in the field of emergency medicine both as to the standard of care and causation. Nor can plaintiff argue that this information was a surprise. As made clear at oral argument, the documents were appended to defendants' motion in limine to preclude Dr. Lang's testimony heard eight days before the start of trial. At the completion of testimony, the trial justice further instructed, without additional objection, as to the jury's consideration of expert witnesses.

After three weeks of trial, the jury then deliberated "for about one half (1/2) hour" before returning a verdict for defendants. Besides the three documents, they were able to consider other exhibits including Dr. Lang's impressive forty-four page curriculum vitae as well as the testimony of witnesses.

Despite the instruction of the trial justice declaring Dr. Lang's expertise, his timely and balanced cautionary instruction at the voir dire hearing, and, in my view, his accurate final expert instruction, the majority suggests that the jury plucked out these three single-spaced documents to eviscerate the plaintiff's case. I cannot accept that conclusion, and thus, respectfully dissent.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**      Jennifer O'Connor v. Newport Hospital et al.

**CASE NO:**      No. 2012-87-Appeal.
(NC 07-238)

**COURT:**      Supreme Court

**DATE OPINION FILED:**   March 17, 2015

**JUSTICES:**      Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**      Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**     Newport County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Stephen P. Nugent

**ATTORNEYS ON APPEAL:**

For Plaintiff:  Mark B. Decof, Esq.

For Defendants:  William H. Jestings, Esq.
William F. White, Esq.