June 19, 2017

**Supreme Court**

No. 2016-116-C.A.
(P1/13-3713AG)

State                          :

v.                          :

James Adams.                          :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                                    :

v.                                       :

James Adams.                             :


Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.**  The defendant, James Adams, appeals from a judgment of conviction of one count of first-degree robbery, two counts of felony assault, one count of second-degree murder, and one count of committing a crime of violence while possessing a firearm.  These charges stemmed from allegations that the defendant, during June and July 2012, accessed Backpage.com[1] for escort services and had female escorts meet him at his designated location, where he then committed the above-referenced crimes.  Following the jury's guilty verdict, the defendant filed a motion for a new trial, which was heard and denied by a justice of the Superior Court.  On appeal, the defendant maintains that he is entitled to a new trial because the weight of the evidence was insufficient to convict him and that the trial justice erred in deciding otherwise.  The defendant also appeals the admission of certain evidence relating to cell phone data and analysis that was introduced at trial, which he claims should have

---

[1] Backpage is a classified advertising website where individuals can list a variety of products and services.  Until January 2017, Backpage included an adult section containing different subcategories of various sex work professions, including escorts and strippers.  See Alastair Jamieson & Tracy Connor, Backpage Pulls Adult Ads, Blames 'Censorship' After Report on Sex Trafficking, Prostitution (Jan. 10, 2017), http://www.nbcnews.com/news/us-news/backpage-pulls-adult-ads-blames-censorship-after-report-sex-trafficking-n705056.

been excluded by the trial justice. For the reasons stated herein, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

### A

### Initial Murder Investigation

On July 20, 2012, Patrolman Jared Hardy of the Cranston Police Department responded to the area of 391 Farmington Avenue in Cranston (the property), a three-family home with "a detached garage to the left rear" (the garage). Patrolman Hardy was dispatched in connection with a report of "an oozing liquid which was coming out of the garage" that had a "bad smell." Upon entering the garage he "was struck with the smell of decaying flesh," and he determined that the smell was emanating "from the back left corner of the garage." Upon walking to the back left corner and tipping a green sofa over to identify the source of the smell, Hardy found a badly decayed body of what appeared to be an African-American female (the decedent). Hardy immediately called for a supervisor and secured the scene.

Detective William John Palmer of the Bureau of Criminal Identification (BCI) unit[2] of the Cranston Police Department was called into work to investigate this matter. Upon arriving at the property with another BCI detective, Peter Souza, Det. Palmer observed "a dark colored stain that appeared to be coming from the * * * garage['s] * * * east side wall." Upon entering the garage, he witnessed the tipped-over green sofa and the decomposing body of the decedent. He

---

[2] The BCI unit is a subsection of the detective division. The unit is responsible for processing crime scenes—including photographing, identifying, collecting, maintaining, and following up on the evidence.

described the garage as cluttered and with the appearance that it was used for storage and "for people hanging out."

Detective Souza took several photographs of both the inside and outside of the garage and of the decedent's body. Detective Palmer also photographed "contents that were at [the decedent's] feet that appeared to be dumped there," and he observed a tan pocketbook and a green piece of clothing—later identified as a jumper. He identified several other items found by the decedent's feet, including a cell phone charger, lotion, earphones, a Massachusetts identification card, and a black wig. Under the black wig, he discovered a body spray, Vaseline petroleum jelly, a couple of debit cards belonging to one Mary Grier, and a pair of size medium Joe Boxer underwear.

Detective Sergeant Michael Hollis Gates of the Cranston Police Department, who had also responded to the property that day, was given the Massachusetts identification card, but he could not identify the decedent in the garage due to the extensive decomposition of the body. Detective Gates testified that the name on the identification card was Mary Grier. On the next day, July 21, he, along with another detective, "follow[ed] up with the address that [they] had on the identification that was recovered next to the body." That address was in Dorchester, Massachusetts, where they met with Leslie and Jeanetta Trotman (the Trotmans), Grier's foster parents.[3] They indicated to the detectives that they believed Grier had been working at Foxy Lady, an adult entertainment club in Providence, and they also provided the detectives with the address of Regina Grier, Grier's adoptive mother.[4] Detective Gates went to Foxy Lady to follow

---

[3] At trial, Jeanetta Trotman testified that Grier had been her foster child from the moment Grier was one day old until she was adopted four years later.
[4] Regina Grier informed the detectives that she had last spoken to Grier sometime shortly after the Fourth of July holiday that year.

up on the information he had received from the Trotmans, and he learned that Grier "hadn't been working there recently."

The following day, July 22, Det. Gates met with Jesse Adams, defendant's brother. According to Jesse Adams, in June 2012, defendant lived in the garage.[5] Following the meeting with Jesse Adams, Det. Gates asked that a photo array be prepared containing defendant's image and that defendant's parole officer be contacted to ascertain defendant's whereabouts. That same day, after having become confident that the decedent was Grier, Det. Gates returned to Dorchester to inform both sets of parents that Grier had passed away. Detective Gates obtained Grier's cell phone number, and a fellow detective prepared search warrants for certain cell phone records. Subsequently, Det. Gates secured an arrest warrant for defendant.

On July 23, 2012, Det. Gates interviewed Jessica Dyer after "[he] was given information that there may have been a second female present at * * * [the] garage * * * the night that [they] believe[d] * * * Grier was murdered." Dyer alleged that she had been assaulted by a man in the same garage on June 30, 2012. Detective Gates conducted a photo array with six photos of males who had the same general characteristics as defendant. Dyer identified defendant as her assailant.[6]

On July 24, the detectives learned of defendant's whereabouts and proceeded to the Charlesgate Manor apartment complex in Providence to execute an arrest warrant. Detective Jaime Cahill of the Cranston Police Department testified that he entered a building in the

---

[5] Detective Gates also obtained defendant's phone number from Jesse Adams. At trial, Jesse Adams testified that, in June 2012, he would give defendant rides and that he had picked defendant up and dropped defendant off "[a] good two dozen times" at the garage. He attested that, after seeing the garage on television and recognizing it as the place at which his brother was staying, he contacted the police.

[6] Jessica Dyer's allegations gave rise to three of the charges in the indictment, and her trial testimony is summarized in greater detail in Section III, B, of this opinion.

apartment complex and waited for defendant by the elevators with other officers. Realizing that defendant did not come off of the elevator, Det. Cahill rushed outside the building and observed defendant "running through the parking lot." He further observed defendant discard a backpack, "which another detective secured," while another detective tackled defendant.

Detective Souza testified that he was called to the location of the arrest to collect a "red and black backpack, a couple of bottles of beer, [a] bottle of water, * * * and an Airsoft pistol." As part of the investigation, he test-fired the pistol found in the backpack and confirmed that this "pistol [was] an operable firearm" that was capable of firing plastic and metal projectiles.

On July 26, Evonna Malave, who had previously reported to the police that, on June 24, 2012, she had been sexually assaulted and robbed by a man on School Street in Johnston, went to the Johnston Police Department, where she gave a statement and identified defendant as her assailant.[7]

On December 6, 2013, defendant was charged by criminal indictment with the murder of Grier (count 1), two counts of felony assault upon Dyer (counts 2 and 3), two counts of committing a crime of violence while in possession of a firearm (counts 4 and 11), two counts of first-degree sexual assault upon Malave (counts 8 and 9), first-degree robbery of Malave (count 10), and unlawful possession of a firearm (count 12).[8] These counts were the subject of a ten-day jury trial, during which a total of twenty-eight witnesses testified. These witnesses included the detectives involved in the investigation, forensic and cell phone data experts, the two complaining witnesses, and several individuals who knew defendant in 2012.

---

[7] Evonna Malave's allegations gave rise to four of the charges in the indictment, and her trial testimony is summarized in greater detail in Section III, C, of this opinion.

[8] The original indictment also included a first-degree sexual assault upon Adetarsha Adewuyi (count 5), first-degree robbery of Adewuyi (count 6), and committing a crime of violence while in possession of a firearm (count 7). Counts 5, 6, and 7 were severed prior to trial.

**B**

**Forensic Analysis**

Doctor Carolyn Revercomb, a former assistant medical examiner at the Office of State Medical Examiners for Rhode Island, testified about the forensic autopsy that she conducted on the decedent in July 2012. She explained that the decedent was identified through dental records as Mary S. Grier and that the decedent's body was "in a state of decomposition with partial skeletonization, meaning exposure of bone," when examined. Doctor Revercomb explained that the decedent's body arrived nude, with a ligature wrapped around her neck, a belly button piercing, and an anklet. She noted that a jumper-type garment accompanied the decedent's body.

After explaining the procedure that she followed in examining the decedent's body, Dr. Revercomb acknowledged that "decomposition can obscure surface features of the body." During her external examination, Dr. Revercomb discovered bruising "on the front of the right knee, on the front of the lower right leg, and over the back of the index finger on the right hand." She also testified to "a fracture without any bleeding into it of the left clavicle" and opined that, to a reasonable degree of medical certainty, based on "[b]oth the appearance of the fracture break into that bone and its relationship to the body position at the scene," that "this [was] a postmortem fracture; that [Grier] did not have a blood pressure when it happened." During her internal examination of the decedent, Dr. Revercomb "saw some focal bleeding in the scalp."

Doctor Revercomb concluded that the cause of death was homicidal violence. She explained that "[h]omicidal violence is a blanket term for findings associated with an assault by another or others." She reached this opinion based on several factors, including "the positioning of the body in a concealed location where it was found, the presence of the ligature around the neck with an * * * irregular knot[,]" the fact that the body was nude, the fact that there were

- 6 -

clothing and a wig present at the scene, "indicating a struggle," and the fact that there were bruises on the decedent's right leg and on her right-hand index finger, which Dr. Revercomb noted as resulting "potentially from a defensive cause or a defensive-type bruise." She also indicated that the time of death was difficult to pinpoint due to the extent of decomposition. She opined that, based on the maggot activity she observed when visiting the garage on July 24, the death could have occurred "a week or more" prior to that date.

Tamara Wong, a forensic scientist employed at the Rhode Island Department of Health Laboratories, testified that she conducted a DNA analysis of "[a] ligature, three cuttings from a couch,"[9] swabbing from the tan pocketbook, fingernail clippings belonging to the decedent, and "a reference sample from [defendant]." Her analysis of these items was inconclusive, either because there were multiple contributors to the DNA profile or because there was no DNA profile. Wong also analyzed the pair of Joe Boxer underwear found in the garage, which resulted in a mixed DNA profile. Wong testified that the mixed DNA profile consisted of a major component and a minor component. Based on her analysis, she concluded that defendant's DNA profile was a match to the profile in the major component found on the pair of Joe Boxer underwear. She noted that there was a "1 in 82 trillion chance that" the DNA profile indicated someone other than defendant.

Additionally, Kevin Horan, a Special Agent in the Federal Bureau of Investigation's (FBI) Cellular Analysis Certificate Survey Team (CAST team), testified regarding his analysis of certain cell phone data from defendant's and Grier's phones. Agent Horan concluded that

---

[9] On July 24, detectives had cut out three sections of the green sofa's fabric containing a semen-like specimen for DNA testing.

defendant's and Grier's cell phones were in the same approximate vicinity on the early morning of July 15, 2012.[10]

## C

### Other Trial Witnesses

Brothers Nhoeuth Nhim and Nhoeun Nhim both testified that they lived in the first-floor apartment of the property during the summer of 2012 and that the garage was used as a "hanging out" space. Nhoeuth testified that, in June 2012, defendant would "hang out" in the garage, and sometimes stay overnight. Nhoeun testified that, during a time period in June and July 2012, defendant would stay in the garage, but he acknowledged that he did not know if defendant would sleep in the garage. Nhoeun also testified that he saw "a white person" that he did not know go into the garage, come out of the garage with a suitcase, and drive off with it. He claimed that the last day that he was near the garage before the police arrived was on July 14 and that defendant was also there. Nhoeuth testified that, sometime in July 2012, he started to clean the garage but did not get very far because of how unpleasant the garage smelled. He claimed to have thought that the smell was due to a dead animal.

Kenneth J. Larney III, defendant's friend during the summer of 2012, also testified that he had seen defendant at the garage during that time, that he drove defendant there "[b]etween five and ten" times because defendant did not have a car, and that he knew defendant had "crashed" at the garage a few times. Larney noted that defendant "was kind of living place to place" and "didn't really have a set living location" at that time. He testified that he had personally "hung out" at the garage, playing cards, listening to music, and being "really nonchalant," approximately five times. He testified that, on July 18, 2012, he was contacted by

---

[10] Agent Horan's testimony was the subject of defendant's motion in limine and is discussed in further detail in Section II, B, of this decision.

defendant and asked to pick up a suitcase that was in the garage. When he went to retrieve the suitcase, he simply lifted the door of the garage, retrieved the suitcase, and left. He claimed that he did not smell anything at that time. He placed the suitcase in the basement of his apartment located on Burnside Street in Cranston. He further testified that defendant informed him that he would eventually pick up the suitcase, but the Cranston police came to his home and retrieved it.[11]

Vanyik Proeun testified that, in July 2012, he resided on the second-floor apartment of the property and that he had become friendly with defendant. Proeun testified that he gave defendant rides and, on one occasion, defendant informed him that he was attracted to strippers. He claimed that defendant always carried a red backpack with him. Proeun also recalled speaking to a police officer on July 21, and he testified that he had smelled the odor in the garage "probably the week before that."

Sarivutha Pich, who also resided in the second-floor apartment, testified that, on July 15, 2012, after returning from a friend's wedding between 3:30 and 4:30 a.m. feeling "kind of buzzed," she proceeded to enter the apartment building through the back when she noticed that the garage light was on. She glanced into the garage and saw defendant in the garage alone. She testified that defendant informed her that everyone had gone to sleep and that he was "going to finish up" and "head out." She testified that she did not smell anything in the garage at that time.

## D

### Testimony of Dayo Oduntan

Dayo Oduntan, who knew defendant for "a little bit over 15 years," testified that the two were "close friends, buddies" when they first met. He testified that eventually he became

---

[11] Detective Souza testified that, on August 4, 2012, he retrieved a suitcase from the basement of 18 Burnside Street.

friendly with defendant's mother and brother and that he would have dinner at defendant's mother's house. Over the course of fifteen years, Oduntan claimed, that he and defendant stayed in touch "[o]ff and on." He testified that, in 2002 or 2003, the two shared an apartment on Federal Hill in Providence. He recalled that, at that time, he observed defendant use the Backpage website and that, on occasion, defendant would "go on there, look[ing] for girls."

Oduntan testified that he was incarcerated at the Adult Correctional Institutions (ACI) in June 2012 for failing to report to parole.[12] He attested that, in July 2012, he saw defendant in prison, but that the two were not assigned to the same area in the ACI at that time. He testified that he then wrote a letter to the Special Investigations Unit "looking for a deal" with respect to his own sentence in exchange for information he had or could get from defendant. He explained that, as a result of a meeting with Cranston detectives, he was assigned to the same cellblock as defendant, but he was unable to strike a deal with the Attorney General's Office regarding his own sentence.

While sharing a cell with defendant, Oduntan testified that he "asked [defendant] bluntly" about the murder and that defendant "right away start[ed] [to] mak[e] gestures and pointing around the room, pretty much insinuating that he was nervous that the room might [have been] bugged or wired." Oduntan testified that, while he was out on the recreational yard, he again asked defendant about the female and defendant "let it be known, yes, he did it." At that time, however, defendant "didn't get into detail" regarding the murder. Oduntan described defendant's demeanor as "[r]eal nonchalant about it. Like it didn't matter or anything like that."

Oduntan testified that, on a later date, when the two were watching a television show where a cartoon character murdered a female and rolled her body in a carpet before disposing of

---

[12] He also acknowledged his criminal record—which included convictions for robbery and larceny.

it, defendant "jumped off the bunk and * * * point[ed] [to] the [television]" and said that that was what he had done and made "strangling gestures." He recounted that eventually defendant seemed more willing to talk about the murder and that defendant said he did not know why the police were "making such a big deal of even looking into it because she was a prostitute." On another occasion, according to Oduntan, the two were watching television again and a female was wearing a "short shirt thing," where the shorts are connected to the shirt and defendant indicated that the female in the rug "was wearing something like that." Oduntan further testified that defendant did not give him a reason for committing the murder and also "didn't seem to care at all."

When Oduntan asked defendant if anyone else was involved in the murder, Oduntan testified, defendant said that "he did it on his own, but he was mad at other people for not helping him dispose of her body." According to Oduntan, defendant named Nhoeuth Nhim as one of the individuals who had refused to assist in removing the body. Oduntan also testified that defendant indicated that he was surprised a friend "K.J." did not "rat on him," since "K.J." had already been questioned, and that "K.J." was supposed to get defendant his clothing. He further testified that defendant said he was sleeping in the garage prior to the murder.

Oduntan wrote another letter to authorities after learning all of this information; and, in the interim, he was released from custody after completing his sentence. He was again arrested and charged with armed robbery in 2013; and, while he was released on bail, he was contacted by the Cranston police regarding his willingness to testify. He acknowledged that he was a paid federal informant, but he insisted that he had not been compensated or received any favors from the state in exchange for his testimony against defendant in this case.

The state rested its case-in-chief on Friday, July 10, 2015;[13] the defense did not present any witnesses. On the following Monday morning, July 13, the jury returned guilty verdicts on a total of five counts in the indictment. The jury found defendant guilty of the second-degree murder of Grier (count 1), felony assault on Dyer with a dangerous weapon (firearm) (count 2), felony assault on Dyer with a dangerous weapon (metal object) (count 3), first-degree robbery of Malave (count 10), and unlawful possession of a firearm (count 12).[14] The defendant's motion for a new trial was heard and denied on September 2, 2015. Subsequently, on November 13, 2015, defendant was sentenced to life imprisonment plus one hundred years to serve.[15] The defendant filed a timely notice of appeal to this Court.

The defendant's arguments on appeal are two-fold; he assigns errors to certain evidentiary rulings of the trial justice and to the trial justice's denial of his motion for a new trial on counts 1, 2, 3, and 10.[16]

## II

### Admissibility of Evidence

On appeal, defendant argues that the trial justice erred in admitting Agent Horan's testimony regarding cell phone technology because, in his view, it constituted a violation of Rule 702 of the Rhode Island Rules of Evidence. The defendant also argues that the trial justice

---

[13] In addition to the witnesses whose testimony is summarized herein, the following witnesses also testified at trial: Leon Sam, Sergeant Dana Gousie, Detective Anthony Sasso, Detective John Cardone, Patrolman Derrick Palazzo, Detective Donald Bucci, and Paul Carney.

[14] The jury returned not-guilty verdicts on counts 8, 9, and 11. Count 4 was dismissed by the state at the close of its case pursuant to Rule 48 of the Superior Court Rules of Criminal Procedure.

[15] The defendant was sentenced to life imprisonment on count 1, fifteen years imprisonment on counts 2 and 3, to be served concurrently, seventy-five years imprisonment on count 10, and ten years imprisonment on count 12.

[16] On appeal, defendant does not challenge the sufficiency of the evidence as it pertains to his conviction of unlawful possession of a firearm (count 12).

should have excluded Agent Horan's testimony based on what he perceived to be a violation of Rule 16 of the Superior Court Rules of Criminal Procedure.

## A

### Standard of Review

It is well established that decisions concerning the admissibility of evidence are "within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent." State v. Mohapatra, 880 A.2d 802, 805 (R.I. 2005) (quoting State v. Grayhurst, 852 A.2d 491, 504 (R.I. 2004)). "The trial justice will not have abused his or her discretion as long as some grounds supporting his or her decision appear in the record." State v. Evans, 742 A.2d 715, 719 (R.I. 1999).

## B

### Testimony of FBI Special Agent Kevin Horan

Prior to trial, defendant filed a motion in limine to have all evidence and testimony relating to cell phone towers and data excluded from trial, as he suggested that such evidence was both untimely and inconclusive. A hearing was held on defendant's motion on May 28, 2015. Agent Horan, whom the state sought to present as an expert witness on cell phone technology, testified at the hearing. Agent Horan testified that he had been a member of the FBI's CAST team since 2010 and that he was trained to track cell phones and to know how cellular networks are built, what frequencies they use, how switches work, and how to utilize cell phone records. He stated that he was also trained on how to conduct a drive test, which includes "specialized gear that * * * scan[s] the radio frequency environment" and at the end of the drive provides a "footprint or a map of what the radio frequency looks like coming off of a cell phone tower." He testified that he has been qualified as an expert witness in approximately fifty-two

other cases and that he has been involved in "maybe a thousand" cell phone investigations throughout his career.

As it pertains to the facts in this case, Agent Horan testified that he analyzed certain T-Mobile, MetroPCS, and AT&T call detail records (CDRs) provided by the state. He presented a PowerPoint that he had prepared based on the CDRs, which illustrated the approximate locations of the cell phones as they communicated with the towers in the early morning of July 14, 2012. The PowerPoint also showed the drive test he conducted which revealed that, in the area of the garage where Grier's body was found, the tower section with the dominant signal was the one to which defendant's phone connected during Grier's final phone call. Agent Horan acknowledged that his tests and analysis could not pinpoint the exact location of the phones during the transmissions, but only their approximate locations.

Following Agent Horan's testimony, defendant argued to the trial justice that the agent's testimony should be excluded both as a discovery violation and because it did not pass the Daubert analyses.[17] The trial justice found that Daubert did not have any application to the proceedings, stating that there were "scores of cases that [he had] seen on the shelves from federal and state courts. There are periodicals, secondary sources addressing the subject," and that "[t]his [was] not new stuff." He opined that the "analysis of cell phone records by expert testimony is certainly helpful to the trier of fact" and that Agent Horan's inability to "pinpoint the precise location of the phone [was] not a reason to exclude his testimony." The trial justice

---

[17] The defendant was referring to the seminal Supreme Court case of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Although this Court has declined to expressly adopt Daubert, we have drawn guidance from its principles. See Owens v. Silvia, 838 A.2d 881, 890 (R.I. 2003); see also DiPetrillo v. Dow Chemical Co., 729 A.2d 677, 685 (R.I. 1999).

noted that Agent Horan had circled an area, or "footprint," and had opined that the calls were made within that particular area and that what weight to give to his opinion was a task for the jury.

Moreover, the trial justice discussed defendant's contentions as they related to a "so-called Rule 16 or late discovery." The trial justice specifically noted:

> "[They were] a month ahead of the trial. It should [have been] ample time for [defense counsel] to speak with the expert that he ha[d] engaged and ha[d] had on his Rolodex for months * * *. If [defense counsel] want[ed] to invite the court reporter to do a transcript of what [they] did th[at] morning so [he could] ship it off to [defendant's] expert, that[] [was] fine. * * * [I]f it turn[ed] out that [defense counsel] need[ed] additional time, that [he] [could not] try the case when [they were] anticipating it, so be it, [he would] get the extension, the time that [he] need[ed]."

The trial justice added that the transcript would be "at the [s]tate's expense," and the hearing on the matter concluded. There is no indication or allegation that defendant sought a continuance. At trial, Agent Horan testified consistently with his testimony at the hearing on defendant's motion in limine.

**1. Rule 702: Expert Testimony**

As to Rule 702, defendant asserts that the trial justice abused his discretion in admitting the testimony because Agent Horan "failed to demonstrate either that his conclusion was the product of scientifically valid theories and methodologies, or that [the] theories and methodologies have been subjected to peer review." Moreover, defendant avers that the testimony should have been excluded at trial because Agent Horan could not provide an opinion as to what he believed was the closest cell phone tower to the crime scene due to the particular terrain or edifices in the surrounding area. Thus, defendant posits, the trial justice erred in allowing the introduction of the testimony and in making "a sweeping generalization about the

qualifications of * * * [Agent Horan]," by finding that "[Agent Horan] must really be an expert" in the field.

"The purpose of expert testimony is to aid in the search for the truth." Morabit v. Hoag, 80 A.3d 1, 11 (R.I. 2013) (quoting Morra v. Harrop, 791 A.2d 472, 477 (R.I. 2002)). Rule 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion." We recognize that "[a] witness qualifies as an expert as long as his or her 'knowledge, skill, experience, training or education' [can] deliver a helpful opinion to the jury." Beaton v. Malouin, 845 A.2d 298, 301 (R.I. 2004) (quoting Owens v. Payless Cashways, Inc., 670 A.2d 1240, 1244 (R.I. 1996)).

When litigants adduce technical or novel evidence at trial, the trial justice must act as a gatekeeper and perform "a preliminary evidentiary hearing outside the presence of the jury in order to determine whether such evidence is reliable and whether the situation is one on which expert testimony is appropriate." Morabit, 80 A.3d at 11 (quoting DiPetrillo v. Dow Chemical Co., 729 A.2d 677, 685 (R.I. 1999)). The trial justice's role as a gatekeeper is to assure that the "proposed expert testimony, presented as a scientifically valid theory, is not mere 'junk science.'" Id. (quoting Owens v. Silvia, 838 A.2d 881, 891 (R.I 2003)). In so doing, "[t]he trial justice thereby ensures that the trier of fact considers 'only expert testimony that is based on ostensibly reliable scientific reasoning and methodology.'" Id. at 11-12 (quoting Owens, 838 A.2d at 891).

In DiPetrillo, 729 A.2d at 689, we provided four nonexclusive factors to the trial courts to assist in the consideration of expert testimony involving novel or technical theories or

procedures. Those factors are: "(1) whether the proffered knowledge can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory or technique has gained general acceptance in the relevant scientific field." Id.; see Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-94 (1993). "Satisfaction of one or more of these factors may suffice to admit the proposed evidence and the trial justice need not afford each factor equal weight." Morabit, 80 A.3d at 12. Furthermore, "when the proffered knowledge is neither novel nor highly technical, satisfaction of one or more of these factors is not a necessary condition precedent to allowing the expert to testify" and "[t]he proponent of the evidence need only show that the expert arrived at his or her conclusion in what appears to be a scientifically sound and methodologically reliable manner." Owens, 838 A.2d at 892.

It is our opinion that the trial justice did not abuse his discretion in allowing Agent Horan to testify regarding cell phone technology—a field in which he is an expert by all accounts. We agree with the trial justice that Agent Horan's expert testimony regarding cell phone towers was not novel. See United States v. Jones, 918 F. Supp. 2d 1, 7 (D.D.C. 2013); People v. Wells, No. A112173, 2007 WL 466963, at *11 (Cal. Dist. Ct. App. Feb. 14, 2007) ("It is simply not true, as [the] defendant contends, that the use of cell phones to locate a caller is new to the law. Cell phone evidence has been introduced for that purpose in a number of cases across the country * * *."); People v. Davis, No. A109671, 2006 WL 2965368, at *10 (Cal. Dist. Ct. App. Oct. 18, 2006) ("[T]he technology in question is neither new to science or the law."); Pullin v. State, 534 S.E.2d 69, 71 (Ga. 2000). Therefore, because no evidentiary hearing was necessary, the state "need[ed] only [to] show that [Agent Horan] arrived at his * * * conclusion in what appear[ed] to be a scientifically sound and methodologically reliable manner." Owens, 838 A.2d at 892. After

- 17 -

a careful review of both the hearing and trial transcripts, we are satisfied that the state has met this burden.

Moreover, defendant specifically noted that he had "never suggested that the science is junk science." Instead, his concern was that Agent Horan had not testified as to an opinion based on a reasonable degree of technological certainty. However, Agent Horan's inability to pinpoint the exact location of the cell phones on the morning in question to a reasonable degree of certainty does not render his testimony inadmissible. Instead, the jury was tasked with determining the weight of Agent Horan's testimony in light of that fact. Moreover, defendant availed himself of the opportunity, both at the hearing on the motion in limine and at trial, to fully cross-examine Agent Horan on the limitations of cell phone tower science.

### 2. Rule 16: Alleged Discovery Violation

Furthermore, defendant argues that the trial justice should have excluded Agent Horan's testimony under Rule 16 because Agent Horan "did not set forth any opinion much less the bases and reasons for [his] opinion, and did not comply with either the discovery request [at trial] or [Rule 16]." The defendant contends that the trial justice clearly abused his discretion when he did "not fashion an effective remedy" after the state disclosed Agent Horan's expert testimony one month before trial, and he alleges that the one-month period was insufficient to prepare for this testimony.

"Rule 16 governs discovery procedures in criminal trials." State v. Santiago, 81 A.3d 1136, 1140 (R.I. 2014). "It is well settled that 'Rule 16 requires that discovery be made in a timely manner * * * in order that defense counsel may marshal the information contained in the discovery material in an orderly manner.'" State v. Rosado, 139 A.3d 419, 424 (R.I. 2016) (quoting State v. Huffman, 68 A.3d 558, 568-69 (R.I. 2013)). "The overarching purpose of Rule

16 is 'to ensure that criminal trials are fundamentally fair.'" Santiago, 81 A.3d at 1140 (quoting State v. Briggs, 886 A.2d 735, 754 (R.I. 2005)). "It includes a requirement that '[w]hen a criminal defendant requests discovery material concerning witnesses the state may call to testify at trial, Rule 16 obligates the state to produce only prior recorded statements of a witness, a summary of the witness's expected trial testimony, and any records of prior convictions.'" Id. (quoting Briggs, 886 A.2d at 754).

"A trial justice considering an alleged discovery violation pursuant to Rule 16 * * * should examine four factors: (1) the reason for the nondisclosure; (2) the prejudice to the other party; (3) whether or not a continuance can rectify any such prejudice; and (4) any other relevant factors." Rosado, 139 A.3d at 424 (quoting State v. Marte, 92 A.3d 148, 151 (R.I. 2014)). "It is well established that, when this Court reviews questions regarding claimed Rule 16 discovery violations, 'the applicable standard is narrow: [T]he trial justice must have committed clear error.'" Santiago, 81 A.3d at 1139 (quoting Briggs, 886 A.2d at 755). Therefore, because the trial justice is in the best position to determine whether any harm has resulted from alleged noncompliance with discovery motions, we will not disturb a trial justice's ruling on claimed Rule 16 violations absent a clear abuse of discretion. See State v. Wilson, 568 A.2d 764, 767 (R.I. 1990).

It is our opinion that the trial justice did not abuse his discretion in this case given that, at the May 28 evidentiary hearing, the trial justice specifically informed defense counsel that "if it turn[ed] out that [he] need[ed] additional time, * * * [he would] get the extension, the time that [he] need[ed]." The defendant's decision not to request a continuance is fatal to his claim of error on appeal. See Rosado, 139 A.3d at 425. Accordingly, based on the circumstances of this case, we are of the opinion that the trial justice's decision to allow the testimony and not sanction

the state, as defendant had requested, was well within his discretion, and we decline to disturb his ruling.

C

<b>Cell Phone Records</b>

The defendant also contends that the trial justice abused his discretion in admitting his MetroPCS cell phone records (MetroPCS records) through Susan Johnson, an employee of T-Mobile. In particular, defendant claims that the trial justice erred in admitting the evidence under the business-records exception to the hearsay rule because the pertinent "records were kept in the ordinary course of business of MetroPCS, not T-Mobile." Additionally, defendant asserts that the cell phone records could not be authenticated by Johnson because she did not physically have the cell phone records when testifying at trial.

At trial, Johnson testified that, for eighteen years, she managed cell phone records at T-Mobile. In 2013, after T-Mobile and MetroPCS merged, Johnson also became responsible for maintaining MetroPCS records. At that time, she was trained on the procedures of MetroPCS for storing and providing records, which were the same as T-Mobile's. Because T-Mobile and MetroPCS records did not merge, in order to obtain the pertinent records for this case (cellular data from 2012), Johnson had to contact another MetroPCS employee who was responsible for maintaining MetroPCS records.[18] On cross-examination, Johnson acknowledged that she had obtained the MetroPCS records the Friday before she testified from the MetroPCS employee who first received the request in 2012 and that, from 2012 through 2015, the records were kept with MetroPCS, not T-Mobile.

---

[18] When the subpoena in this case was first issued in 2012, T-Mobile did not yet own MetroPCS.

Following Johnson's testimony, a colloquy ensued in which defense counsel, as he had done prior to Johnson taking the stand, contended that the MetroPCS records could not be authenticated by Johnson as she had "readily acknowledged" that the MetroPCS records were not kept in T-Mobile's ordinary course of business. Following a recess and further arguments from both sides, the trial justice noted that he was satisfied that the cell phone records met the business-record rule exception and that they satisfied Rule 901 of the Rhode Island Rules of Evidence. The trial justice reasoned that, although "Johnson was not an employee of Metro[PCS] in 2012, she [was], however, entirely familiar with how Metro[PCS] kept its records. She ha[d] firsthand knowledge in that respect because she visited the Metro[PCS] center in Texas and personally familiarized herself with its operations to make that determination." He further noted that the T-Mobile and MetroPCS records "were kept in precisely the same way." In quoting <u>Rhode Island Managed Eye Care, Inc. v. Blue Cross & Blue Shield of Rhode Island</u>, 996 A.2d 684, 692 (R.I. 2010), the trial justice opined that the persuasive force of the records was for the jury to decide.

Rule 801(c) of the Rhode Island Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay testimony, unless meeting an exception to the rule, is generally inadmissible at trial. <u>See</u> Rule 802 of the Rhode Island Rules of Evidence. Rule 803(6) of the Rhode Island Rules of Evidence, colloquially characterized as the "business-records exception" to the hearsay rule, allows a business record into evidence if it was "made at or near the time * * * of a regularly conducted business activity," which must be "shown by the testimony of the custodian or other qualified witness * * *."

This Court has set forth a four-part test for examining and admitting business records into evidence:

> "First, the record must be regularly maintained in the course of a regularly conducted business activity. Second, the source of the information must be a person with knowledge. Third, the information must be recorded contemporaneously with the event or occurrence, and fourth, the party introducing the record must provide adequate foundation testimony." Martin v. Lawrence, 79 A.3d 1275, 1282 (R.I. 2013) (quoting Rhode Island Managed Eye Care, Inc., 996 A.2d at 691).

Furthermore, "[i]n order '[t]o provide [an] adequate foundation a party must prove the first three requirements and authenticate the document or record.'" Id. (quoting Rhode Island Managed Eye Care, Inc., 996 A.2d at 691).

Rule 901 sets forth the analysis to properly authenticate evidence. Rule 901(a) provides that authentication is a "condition precedent to admissibility." "The advisory committee's note to Rule 901 informs that 'authentication and identification are regarded as a special aspect of relevancy'; evidence is relevant only if it is in fact what the party seeking its admission claims it to be." O'Connor v. Newport Hospital, 111 A.3d 317, 323 (R.I. 2015) (quoting Rule 901 Advisory Committee Notes). "[T]he burden of proof for authentication[,] [however,] is slight." Id. (quoting United States v. Reilly, 33 F.3d 1396, 1404 (3d Cir. 1994)).

Indeed, "[a]uthentication is not a high hurdle to clear: Rule 901(a) merely requires 'evidence sufficient to support a finding that the matter in question is what its proponent claims.'" McGovern v. Bank of America, N.A., 91 A.3d 853, 860 (R.I. 2014) (quoting Rule 901(a)). "This Court has taken a flexible and pragmatic approach to Rule 901 by allowing 'a document's authenticity [to] be established in any number of different ways.'" O'Connor, 111 A.3d at 323 (quoting McGovern, 91 A.3d at 860). "We have previously held that 'document authenticity need not be established by any particular means * * * [but] may be accomplished by

any of the methods enumerated in Rule[s] 901 or 902.'"[19] O'Connor, 111 A.3d at 323 (quoting State v. Oliveira, 774 A.2d 893, 925 (R.I. 2001)). "In making Rule 901 determinations, trial justices must decide whether there is enough support in the record to conclude that it is 'reasonably probable' that the evidence is what its offeror [pro]claims it to be. * * * If so, then the evidence's suasive force is for the jury to decide." O'Connor, 111 A.3d at 323 (quoting Oliveira, 774 A.2d at 926). "Thus, a trial justice 'need not find that the evidence is necessarily what the proponent claims, but only that there is sufficient evidence that the jury ultimately might do so.'" Id. (quoting United States v. Safavian, 435 F. Supp. 2d 36, 38 (D.D.C. 2006)).

It is our opinion that the trial justice did not abuse his discretion in allowing the cell phone records to be admitted into evidence through Johnson, as she had knowledge of the record-keeping of MetroPCS. Moreover, Johnson testified that she spoke to the record keeper of the MetroPCS data and that MetroPCS followed the same processes for storing data as T-Mobile. Additionally, we are satisfied that the trial justice did not abuse his discretion in finding that the cell phone records were properly authenticated. As noted, "[a]uthentication is not a high hurdle to clear," McGovern, 91 A.3d at 860; and, after a careful review of the record, we are of the opinion that "there is enough support * * * to conclude that it is 'reasonably probable' that the evidence is what [Johnson] [pro]claim[ed] it to be." O'Connor, 111 A.3d at 323 (quoting Oliveira, 774 A.2d at 926). Accordingly, we perceive no error in the trial justice's evidentiary ruling as it relates to the cell phone records.

---

[19] Rule 901(b) of the Rhode Island Rules of Evidence provides a nonexclusive list of ways to authenticate evidence; Rule 902 of the Rhode Island Rules of Evidence lists documents that are self-authenticating.

# III

## Motion for a New Trial

Finally, defendant argues that the trial justice erroneously denied his motion for a new trial because the weight of the evidence was insufficient to support his convictions. Specifically, he contends that the jury should not have been allowed to consider the testimony of Dyer and Malave because they were not credible witnesses at trial. In addition, defendant contends that his second-degree murder charge should be vacated because there was "no evidence of any type of malice necessary to sustain a second[-]degree murder conviction."

## A

## Standard of Review

On a motion for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure, "the trial justice places himself or herself in the role of a 'thirteenth juror' and then exercises his or her independent judgment as to the credibility of the witnesses and the weight of the evidence." State v. Grantley, 149 A.3d 124, 131 (R.I. 2016) (quoting State v. Matthews, 111 A.3d 390, 398 (R.I. 2015)). "[T]he trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." Id. (quoting Matthews, 111 A.3d at 398).

"If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." State v. Clay, 79 A.3d 832, 842 (R.I. 2013) (quoting State v. LaPierre, 57 A.3d 305, 310 (R.I. 2012)). "Only when the trial justice does not agree with the jury's verdict, [must he or she] embark on a fourth analytical step." Id. The fourth step of the

analysis requires the trial justice to "determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice. If the verdict meets this standard, then a new trial may be granted." State v. Guerra, 12 A.3d 759, 765-66 (R.I. 2011) (quoting State v. Rivera, 839 A.2d 497, 503 (R.I. 2003)).

"When reviewing a trial justice's decision on a motion for a new trial, '[w]e accord great deference * * * because a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses.'" Grantley, 149 A.3d at 131 (quoting State v. Florez, 138 A.3d 789, 794-95 (R.I. 2016)). "If the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong." Id. (quoting Florez, 138 A.3d at 793).

### B

### Counts 2 and 3: Felony Assault

At trial, Dyer testified that, on June 30, 2012, after posting an ad for escort services on Backpage, she received a phone call from someone whom she had never met—but whom she would later identify as defendant. After discussing her fee over the phone, she noted the caller's address and planned to go to 391 Farmington Avenue at the end of her shift at the Cheaters exotic dancing club (Cheaters). She attested that she left work at 1 a.m. and took a cab to the property, where defendant was waiting for her at the end of the driveway. The two proceeded to walk towards the garage, and Dyer believed that they were going into the basement of the

residence through the back.[20]  As they walked, the two shared a cigarette and were no more than an arm's length away from each other.  Dyer described defendant as "white," and "tall" with "evil and empty" eyes.

As they continued up the driveway, defendant "kept asking [her], [a]re you alone?" After confirming a few times that she was, she testified that defendant thereafter "pulled out [a] gun and said be quiet and get in the garage."  She described the weapon as "a black handgun" that he pulled from his waistband.  She testified that defendant told her: "Go in the garage.  I won't hurt you."  She then recounted that, while in the garage, "[she] got to talking to him, and [she] got to a point where [she] could turn [her] back so [she] could walk down the driveway, and that's when [she] ran" and "[defendant] chased [her] all the way down the driveway."  Dyer explained that she "got almost to the end" of the driveway when defendant hit her hard in the back of the head and she fell in the middle of the road.  She could not identify exactly what hit her head, but described it as hard and indicated that it did not feel like a fist.  Dyer testified that, at that time, she yelled, "Help, rape," and someone turned on a light and defendant ran "[b]ack towards the garage."

Dyer testified that she then ran "for about five, ten minutes" until she was picked up by a stranger.  While sitting in the stranger's vehicle, she noticed an injury to her forearm and the stranger drove her to the hospital.  After waiting at Rhode Island Hospital for a few hours without being attended to, Dyer took a cab to Landmark Medical Center in Woonsocket, where she was treated.  She testified that she told the doctor at the hospital that she "fell" because she "didn't want to go in and say [she] was a prostitute, and [her] date [had] just beat [her] up * * *." She also confirmed that she did not go to the police to report the incident at that time.

---

[20] She identified the garage from June 30, 2012, as being the same garage where Grier's body was found.

Approximately two weeks later, Dyer saw on the news "[t]hat a girl was killed in a Cranston garage in the same address [she] went to," and she knew the girl because they had worked at Cheaters together. She testified that, after disclosing her own incident at the garage to two individuals at Cheaters, her boss called the Cranston police, and they came to her place of work and took her to the Cranston Police Department. At the police station, she spoke to Det. Gates and gave a statement. She later testified that she was shown six photographs and that she identified defendant as her assailant. She went through the photo array a total of three times before identifying defendant. During the first array, she did not identify anyone; during the second, she identified two pictures as the possible assailant; and during the third, she identified defendant.

Doctor George Shervanick, a physician who was employed in the emergency room at Landmark Medical Center in June 2012, testified that he treated Dyer for a laceration to her left elbow, requiring fifteen sutures, abrasions to both knees and the left side of her hip, and left rib pain. Doctor Shervanick testified that, although Dyer denied a head injury when he specifically asked her, a history taken from Dyer by a nurse indicated: "hit head (back), no [loss of consciousness]."

Furthermore, Det. Cahill reviewed the cell phone records between defendant's and Dyer's cell phones. His investigation revealed that, on the early morning of June 30, 2012, from 12:24 a.m. to 4:36 a.m., five phone calls and several text messages were exchanged between the two phones and that defendant's cell phone connected to towers in the area of the garage during those transmissions.

In defendant's motion for a new trial following the jury's verdict finding him guilty of two counts of felony assault upon Dyer pertaining to the June 30, 2012, incident, defendant

contended that Dyer was not a credible witness and that her identification of defendant as her assailant could not be relied upon. When considering the motion for a new trial and acting as the thirteenth juror, the trial justice found that Dyer was a credible witness. He highlighted that her failure to disclose a head injury at the hospital did not mean "that * * * defendant didn't hit her in the head." The trial justice also noted that there had not been any pretrial request to suppress either identification in this case, but he added that "any such pretrial motion based upon the evidence adduced at the trial would have been unsuccessful." He expressed that the discrepancies of the identification were brought out at trial and "were not lost on the jury or the [c]ourt."

## C

### Count 10: Robbery

Evonna Malave testified that, on June 24, 2012, she was at a Providence nightclub where she met defendant and accepted his invitation to go to a house party on School Street in Johnston.[21] According to Malave, her family friend Sixto Reyes took her to the address; she said that, upon arriving, she met with defendant, who was waving her down. The two went to the basement through the back of the house. While in the basement, Malave noticed a handgun between boxes near them. She testified that she was scared and nervous and that, at that time, defendant performed cunnilingus on her and had vaginal sex with her. She testified that defendant told her "to do anything he said * * * so he wouldn't use the gun." She testified that defendant stopped having sex with her when her friend, Reyes, contacted defendant's phone, at which time defendant put the gun in a backpack which he had and the two went upstairs so that she could call Reyes back. After Malave spoke to Reyes and arranged for him to pick her up,

---

[21] In 2012, defendant's father and stepmother resided on School Street in Johnston.

defendant began acting nervous and looking up and down the street and "asked [Malave] if [she] had * * * any cash on [her], and [she] told him yeah. He asked [her] if [she] could pass it over to him, and [she] did." She attested that, when he asked for the money, he had one hand on the backpack and one hand inside the backpack holding the gun and that she felt threatened. She recalled that defendant then got inside a vehicle and left and she was eventually picked up by Reyes. Malave attested that, after informing the police what happened, they sent her to Women & Infants Hospital in Providence and that, after waiting "for hours" at the hospital and not being attended, she left.

On July 26, Malave was contacted by the Cranston police, who directed her to the Johnston Police Department, where she gave a statement. At the police department, she was given a photo array, from which she identified defendant; she recalled being a "hundred percent sure" that he was her assailant. During cross-examination, the defense demonstrated that a written statement given to the police, purportedly from Malave, indicated that her assailant had blond hair, tattoos on both arms, and crooked teeth—a description that did not resemble defendant; at trial, however, Malave denied making this statement.

The jury returned not-guilty verdicts on the sexual assault charges, but found defendant guilty of robbery relating to the June 24, 2012, incident with Malave. In his motion for a new trial, defendant highlighted that Malave had identified the perpetrator as "having blond hair and tattoos," but that the photo array presented to Malave contained individuals who all looked like defendant. The defendant also made the court aware that Malave "could not recall what the person looked like" and therefore had Det. Gates bring a picture of defendant before she testified at trial. The defendant argued that Malave was not a credible witness and that her testimony regarding the incident should, accordingly, not have been given any weight.

The trial justice stated that "[t]here was little question that * * * Malave was a prostitute and that [Reyes] was her so-called pimp." He noted that, while defendant was acquitted of the sexual assault count, this did not "diminish the conviction of the robbery charge." The trial justice had "no hesitation in concluding that [Malave] indeed saw * * * defendant's firearm during that assignation." The trial justice found that "defendant knew full well that she had money" and that he "simply decided to retrieve it." The trial justice found Malave credible in this regard and noted that a handgun found in defendant's backpack when he was arrested provided further support for her allegations. He concluded that the "jury decided, after assessing the entirety of the evidence in the case, that * * * defendant had his hand on his weapon in his backpack" when he robbed Malave, that "[t]he presence of the weapon * * * raise[d] the level of the offense to first-degree robbery, and [he] concurr[ed] with that verdict." He noted the discrepancies between her description of her assailant and her subsequent identification of defendant, but indicated that "[s]he was with [her assailant] for a lengthy period of time. And the jury simply ignored, with justification, in [his] view, the hair and any discrepancy, and [he] [did] not fault the jury for having done so. She knew full well with whom she was with that night, and her identification of * * * defendant was not at all mistaken."

**D**

**Count 1: Second-Degree Murder**

At the hearing on the motion for a new trial, defendant noted that "the evidence that[] [had] been presented [was] devoid of any indication that [malice] was present" as required to support a conviction for second-degree murder. He argued that, because the cause of Grier's death was "undetermined homicide" due to the body's decomposition, Dr. Revercomb's testimony was circular and did not sustain a second-degree murder conviction.

In assessing the evidence and denying the new-trial motion, the trial justice noted that, while the state had spent significant time "introducing cell phone evidence, putting * * * Grier's phone in the vicinity of * * * defendant's phone in the Cranston area," thus "help[ing] to fix the date of [Grier's] death on or about the 15th of July, 2012," this testimony "was not as compelling as the evidence provided by * * * Oduntan." Noting that Oduntan's testimony came with its own "historical warts and blemishes," as he had his own lengthy criminal history and had been a paid informant for the federal government, the trial justice explained that "the jury also learned other unshakeable things about Oduntan." He was a lifelong family friend of defendant and defendant's family and was apparently a dependable and credible informant for the federal government given their extended relationship. The trial justice also highlighted Oduntan's ability to recount details of the case that "could only have come from [defendant]," including the style of clothing that Grier wore when she was killed. Moreover, given Oduntan's relationship with defendant, it was likely defendant would have confided in him.

The trial justice also cited to Oduntan's testimony regarding statements defendant made in prison—including that Grier was just a prostitute and that he had left her body behind a sofa in the garage—in concluding that the evidence presented supported a finding of malice. Moreover, he highlighted that several witnesses, including Nhim and Larney, testified that defendant was using the garage as his homestead, that Pich saw "defendant alone in the garage late in the early hours of July 15th," and that Dyer had also testified that defendant had tried to force her at gunpoint in that same garage "a few weeks earlier."

The trial justice concluded that, "if * * * Oduntan's testimony was accepted, [d]efendant['s] * * * conviction on [this] charge was foreordained." Because he, too, "found

[Oduntan's] testimony in this instance and in this case credible and persuasive," he denied defendant's motion for a new trial on count 1.

After a careful review of the trial transcript in its entirety and of the decision of the trial justice denying the motion for a new trial, we are satisfied that he "articulated adequate grounds for denying the motion." Grantley, 149 A.3d at 131 (quoting Florez, 138 A.3d at 793). Clearly, as summarized in this decision, the trial justice carefully reviewed the testimony and weighed the evidence before him. He specifically noted the shortcomings and inconsistencies of certain witnesses, but he ultimately concluded, based on his own credibility determinations, that the weight of the evidence supported guilty verdicts as to counts 1, 2, 3, and 10 of the indictment. We are confident that the trial justice did not overlook or misconceive material evidence nor was he otherwise clearly wrong, and we therefore decline to disturb his decision.

**IV**

**Conclusion**

For the reasons stated herein, we affirm the judgment of the Superior Court. The record of this case shall be returned thereto.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. James Adams. |
| **Case Number** | No. 2016-116-C.A.<br>(P1/13-3713AG) |
| **Date Opinion Filed** | June 19, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Aaron L. Weisman,<br>Department of Attorney General |
| | For Defendant:<br><br>Jodi M. Gladstone, Esq. |